FRED E. HASTINGS, ADMR. ESTATE OF ABBY T. HOLTON *v.*

THEODORE M. ELLIS ET AL.

May Term, 1946.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and JEFFORDS, JJ.

Opinion filed October 1, 1946.

*James B. Campbell* and *Hunt & Hunt* for the plaintiff.

*Witters & Longmoore* for the defendant Ellis.

SHERBURNE, J. On December 4, 1942, Abby T. Holton of Concord had her savings account in the defendant bank made over into the names of herself and defendant Ellis. In the bill of complaint brought by her guardian the plaintiff alleges fraud and undue influence upon the part of Ellis, and lack of capacity upon the part of Mrs. Holton to make a gift, and asks that Ellis be ordered to deliver the bank book representing the account to the guardian, and that the bank be ordered to pay the money in the account to the guardian upon the presentation of the bank book and his order. Both defendants filed answers, and later the defendant bank transferred the deposit into a new account in the name of the clerk of the county court to await the outcome of the litigation, and filed a disclaimer. The case was heard in 1944, before the enactment of No. 30 of the Acts of 1945. Findings of fact were made and decree was entered for the defendants. Prior to the entry of this decree Mrs. Holton had deceased, and Fred E. Hastings had entered to prosecute as administrator upon her estate. The case has been brought here by him on exceptions.

The findings of fact, filed before the death of Mrs. Holton, show that she was 87 years of age, and was a tall, slim, frail person, who had not had any serious illness for the past few years. Her husband died in 1928 leaving her residing alone. He left some property consisting of stocks, bonds, bank deposits and the home, which she

handled, and she received the interest coupons and dividend checks and deposited them in her account until the appointment of a guardian on February 26, 1944. During the lifetime of Mr. Holton bank accounts had been kept by both him and her in their sole names in three banks, but at some time before his death these accounts were changed into joint accounts payable to either or the survivor. She was conversant with joint accounts, knew how they were established, and the rights of the parties with respect to withdrawals. The only near relative of Mrs. Holton is an unmarried nephew, 56 years of age, who came to live with her in February, 1942, after the death of his mother. Defendant Ellis is employed by a plumbing concern in St. Johnsbury. In 1936 this concern installed a heating plant in Mrs. Holton's home. Since that time Ellis had visited there to service the heating plant and to install other equipment. He had also visited there at other times and had befriended Mrs. Holton upon several occasions in different ways. Ellis' wife is a hairdresser and had had Hrs. Holton as a client, and had also visited her upon occasions when Ellis went there either to service the various appliances or to make a social call. On November 17, 1942, Mrs. Holton and Ellis went to the defendant bank in St. Johnsbury, and on that occasion $107.51 was withdrawn to pay for five cashiers checks issued to pay taxes and insurance on Mrs. Holton's home and three other bills against her. On December 4, 1942, Mrs. Holton and Ellis went to the First National Bank in St. Johnsbury and obtained from a safe deposit box her bank book for her account in the amount of $5010.87 in the defendant bank. They then went to the defendant bank where this account was placed in their joint names with the right of survivorship in the presence of Milton A. Julian, a bank employee, who had known Mrs. Holton since 1917. After this was done the new passbook was handed by Julian to Mrs. Holton, who, in turn, handed it to Ellis, after which it was left with the bank for safekeeping. At this time Julian informed Mrs. Holton of the effect of the creation of the joint account. On one occasion subsequent to this date Mrs. Holton withdrew $200.00 from the account, and after this the deposit book remained in the bank until March 7 or 8, 1944, when it was delivered by the bank to Ellis. After his appointment as guardian Hastings learned of the joint account. On March 6, 1944, Hastings made a demand on Ellis for the delivery to him of the passbook

but did not get it, and Ellis went to the bank and got it and notified the bank not to make any payments from the account. On March 8, 1944, Hastings interviewed the bank's officers and gave them a copy of his appointment as guardian and demanded the passbook, but it was not delivered.

Following the death of her husband Mrs. Holton went to the Battle Creek Sanatorium in Battle Creek, Michigan, and upon her return evidenced some peculiarities with respect to her diet. Findings 5 and 12 read as follows:

"5. Commencing sometime in 1941 Mrs. Holton showed evidence of developing hallucinations. These extended from the idea that a neighbor has wished to kill her to making statements that people who were then in good health had been injured or were sick. During the year 1942 these hallucinations continued.

"12. On August 22, 1944, Mrs. Holton was examined by Dr. James C. O'Neil, an expert psychiatrist. On that date he found that she was suffering from senile dementia, and testified that it was his opinion that she was then insane. Senile dementia is a progressive disease developing from a state of normalcy to insanity. I am unable to find by a preponderance of the evidence that though Mrs. Holton was suffering from senile dementia on the 22d day of August, 1944, when she was examined by Dr. O'Neil, that almost a year and nine months prior to that time, namely on the 4th day of December, 1942, that her mental state was such that she was not appreciative of the act which she was doing when she transferred the account in the Passumpsic Savings Bank from her sole name to the joint names of herself and Ellis. On the contrary I find that on that day Abby T. Holton knew what she was doing and did what she intended and desired to do. I fail to find that any fraudulent acts by defendant Ellis or undue influence on his part prompted Abby T. Holton to create the joint account in the Passumpsic Savings Bank."

EXCEPTIONS RELATIVE TO EVIDENCE

■ Dr. O'Neil, called by the plaintiff as an expert in mental diseases, testified to examining Mrs. Holton on August 22, 1944, and that from what he then observed and learned and the testimony he had heard in court he was of the opinion that she was insane on December 4, 1942, and was incompetent to transact any business at that time. He was then asked in separate questions if she was then competent to make a gift, to deal with or dispose of her property, or to reach a decision in her own mind as to the prudent disposition of her property; and on reexamination he was asked if she was competent to go to the bank on that date and change a bank account of over $5000.00 from her name alone into a joint account with herself and another person, without any consideration from that other person, and without any apparent reason for doing so. These questions were excluded subject to exception, upon the ground that they called for an opinion upon the ultimate question for the chancellor to decide. We need not labor the question as to whether an expert may never testify to an ultimate fact, as each of the questions here involved a question of law as well as of fact. An expert cannot be asked if the person in question was competent to make a deed or will, since that involves a legal opinion as to what constitutes such competency. 20 Am Jur Evidence, § 799. We said in *Fairchild* v. *Bascomb*, 35 Vt 398, 416, 417, a will case, "what is sufficient capacity to transact business, or to make a will, is a matter of law, depending somewhat upon the nature of the business. A witness may not correctly apprehend the rule of law, and if he uses such expressions may be misled himself, or may mislead the jury. Hence the question should be so framed as to require him to state the measure of the testator's capacity in his own language, and by such ordinary terms or forms of expression as will best convey his own ideas of the matter." See also *May* v. *Bradlee*, 127 Mass 414; *Hall* v. *Ferry*, 87 Me 569, 33 A 160, 47 Am St Rep 352; *Coblentz* v. *Putifer*, 87 Kan 719, 125 P 30, 42 LRANS 298. See also *Chickering* v. *Brooks*, 61 Vt 554, 562, 563, 18 A 144. As to the question asked upon reexamination the defendant objected that it included elements not in the case, such as, without any reason or any foundation, and plaintiff then made no claim that they were in the case. These exceptions are not sustained.

In the direct examination of Julian, assistant treasurer of the

defendant bank, as defendant's witness, he testified regarding the source of the disputed account, that it was opened in Mrs. Holton's name in 1899, and in 1919 was transferred to a joint account with her husband, and that at the death of her husband in 1929 it became her property. Whereupon the plaintiff inquired the materiality and purpose of going back into these old accounts, and the defendant replied that it was simply to show that Mrs. Holton had been familiar with a joint account since 1919, and that after her husband's death she made deposits and withdrawals from it. Upon the offer of the ledger cards of the bank plaintiff observed that it seemed pretty remote for any purpose here, and upon their reception an exception was saved on the ground of the offer as showing Mrs. Holton's familiarity with the handling of a joint account, because of going back to a period in which there was no issue whatever as to Mrs. Holton's mental condition. Upon this exception the plaintiff contends that what Mrs. Holton knew about how a joint account operated 10 or 20 years ago before the time in question argues nothing as to her mental state at such time. He says there is no basis for believing that early knowledge is effectively retained in a mind afflicted with senile dementia. The chancellor evidently did not credit Dr. O'Neil's testimony as to Mrs. Holton's condition on the date in question and instead believed other evidence as to her mental capacity, and what she knew long before had some tendency to show that she knew it then. This exception, as well as the exception to similar evidence about the deposits in the Citizen's Savings Bank & Trust Company, is not sustained.

Julian, as defendant's witness, described what occurred when the joint account was set up on December 4, and testified that after the new bank book was made out he delivered it to Mrs. Holton, and she immediately gave it to Ellis, and Ellis left it at the bank for safe keeping, and that after that was done he had nothing further to do with it until Hastings came into the bank. In cross-examination he was asked when Hastings was in, and answered March 3rd or 4th. In reply to a question if Hastings had any talk with him on that occasion he said he did. He was then asked, "What did he ask you?" Upon objection that it was entirely immaterial because the gift had been completed, or it hadn't been completed long before that, the status had long been fixed, and the bank had been dismissed from the case and was no longer in court, the question was

excluded and the plaintiff excepted. In this connection the plaintiff offered to show that when Hastings inquired about the deposit Julian made certain statements about the existence of the deposit and refused to recognize the authority of Hastings, and that the bank book was then in the bank's possession, all as bearing upon the character of the deposit, the account that was set up there, and the intention of the parties when they set it up that Julian had testified it was a joint account available to either one and after careful explanation to Mrs. Holton, and that when the guardian inquired about the account, and the bank, with the bank book right in its possession, refused to recognize the guardian's right because the bank book wasn't presented, it was a highly material circumstance on the character of the deposit set up and the explanations they made. Upon such offer the question was again excluded, and exceptions were allowed on all the grounds stated. Julian was then asked if he knew anything about Mrs. Holton's withdrawal of $200.00 on January 29, 1943, and he replied that he didn't, that he wasn't there and had nothing to do with it. He further testified that the bank's record of that transaction was in the handwriting of Miss Coombs, one of the clerks in the bank; that so far as he knew the bank book hadn't been turned over to Mrs. Holton after December 4, 1942; that he did not know of her ever having had possession of it; that so far as he knew the bank raised no objection to the withdrawal on January 29, 1943; that the item was entered on the bank book; and that it was the practice to require the production of the bank book when a withdrawal was made, it says so right in the book. He was then asked, "I know it does, and when Mr. Hastings, the guardian, attempted to withdraw, that was what was said to him, wasn't it . . . he would have to have the pass book to withdraw it, wasn't it?" This question was excluded and an exception was allowed. When next asked if Mrs. Holton did not make her withdrawal without the bankbook Julian replied that he thought the book was presented, according to his understanding of it, and by later testimony showed that his understanding was based upon the fact that the book indicated the entry of it at the time, but that he was not there and knew nothing about it. He was then asked if he had any understanding about the location of the bank book at that time, and the question was excluded and an exception was allowed. Although Miss Coombs later testified to Mrs. Holton's withdrawal

and having been given access to the bank book, it is claimed that the above rulings were an unwarranted denial and restriction of the right of cross-examination, and that why Julian, with the book in the bank should refuse the guardian's request for a withdrawal on the ground that the book was not presented was a matter of great importance in getting at the good faith of the transaction of December 4, 1942, and in determining whether that transaction was put through in good faith, or was brought about by the machination of Ellis assisted by a cooperative Julian.

While a reasonable opportunity to show in cross-examination that a witness is unreliable, prejudiced, or biased is a matter of right, and much latitude is to be allowed in this line, the extent to which it shall be permitted to proceed rests largely in the sound discretion of the trial court, whose action will not be revised here unless an abuse of discretion is shown, and the contrary not appearing it will be taken that the ruling was made as a matter of discretion. *State* v. *Schoolcraft*, 110 Vt 393, 8 A2d 682; *Gero* v. *John Hancock Life Ins. Co.*, 111 Vt 462, 473, 18 A2d 154; over a year had elapsed since the transaction of December 4, 1942, before this interview with Hastings, and as in the Schoolcraft case, supra, the offered evidence had only remote bearing upon the issue, and was speculative in nature. These exceptions are not sustained.

Plaintiff Hastings testified that shortly after his appointment as guardian, in his search to locate Mrs. Holton's property he went to the defendant bank and asked Julian, its assistant treasurer, if she had some money there, and in reply to the question, "And what did he tell you?" Julian replied that she had no money there. Upon defendant Ellis' objection the answer was stricken out and the question was excluded subject to exception. The objection was that it was immaterial and that the fund was then in the custody of the court, and plaintiff replied that that didn't render immaterial how the deal was put through, and that it was important in view of what transpired later, the details of which were not stated. The witness later testified that he learned at that time there was not any money there belonging to Mrs. Holton, and that on the next day he went back to the bank and learned about the joint account. It is claimed here that Julian's conduct was material on the question of the good faith of Ellis and the credibility to be given Julian's testimony. If Julian's conduct had any bearing upon Ellis' good faith we will

presume that the chancellor in the exercise of his discretion excluded the question as being too remote in point of logical relation to the issue on which it was offered. *Dalpe* v. *Bissette*, 99 Vt 179, 182, 130 A 591. We need not consider the question of Julian's credibility as a witness as that point was not made below. This exception is not sustained.

On March 8, 1944, Hastings and his attorney went to the defendant bank. Hastings testified that some request was made of the bank on that occasion. He was then asked, "As to the number of the account?" and the question was objected to as immaterial and excluded subject to exception. This exception cannot be sustained. There was no offer. *Macauley* v. *Hyde*, 114 Vt 198, 202, 42 A2d 482. This exception was also inadequately briefed, as was also the last exception mentioned in the brief taken during the examination of Hastings, which is not sustained.

Defendant Ellis was called by the Plaintiff and cross-examined at great length. Among other things he testified to being at Mr. Campbell's office with Hastings, where he learned that Hastings had been appointed guardian, and where Hastings demanded the bank book of him, and that very shortly afterward he went to the bank and got the book; that the reason why he got it was because he had learned that a guardian had been appointed and because the book was made out in his name too and he had a right to it; that he had left it at the bank so that Mrs. Holton could get some money if she needed it, but didn't leave it at the bank so that the guardian could have some money if she needed it, because the guardian informed him she never would need it; that at Campbell's office Hastings was asking for the book, and he told him that he didn't feel like giving it up, and in case Mrs. Holton ever wanted anything he wanted to get it for her, and Hastings assured him that she had enough to see her through without touching that; that he got the book because Mrs. Holton had got a guardian appointed over her and Hastings demanded the book, and he had no means of knowing what her account was, how she was fixed, and what she wanted, that he asked permission to go up and see Mrs. Holton and Hastings told him that he would stop him from doing so if he tried. The examination then proceeded as follows:

> "Q. What business of yours was it about Mrs. Holton?

A. I am interested in her welfare.

Q. Is it any concern of yours when she had a legal guardian, to be messing into her affairs?

A. In that case it was.

Q. Why, A. Because the book is in my name.

Q. This was a joint account, was it not?

A. That is right.

Q. And you understood that Mrs. Holton had an equal right to the possession of that book with yourself, did you not?

A. That is right.

Q. With that understanding, after Mrs. Holton got a guardian and the guardian asked you for the book, why didn't you turn it over to him?

A. Because I wasn't satisfied that she needed it.

Q. So you were sitting in judgment upon the guardian, were you?

A. That is right."

Ellis was then asked, "That has been your attitude ever since, hasn't it, Mr. Ellis, that you are not satisfied with the way the guardian is handling Mrs. Holton's business, and therefore you are holding onto that book and control of that account, is that right?" And the question was excluded subject to exception. Ellis was next asked, "You never responded to any demand for that book, did you?", and answered, "No sir," and upon objection being made, the chancellor ruled, "We won't go into that any further. We will exclude any further questions as to why or why not he hasn't turned over the book." To which no exception was taken. The plaintiff claims that the exclusion of the question excepted to was an unwarranted restriction and denial of the right of cross-examination of a party, and says that upon the issue of the good faith of Ellis in the transaction of December 4, 1942, his attitude toward the guardian with reference to the bank book, in view of the position taken by the bank and its officials, was highly important. The previous answers of the witness so nearly covered the same ground, that we perceive no abuse of discretion in the exclusion of this question. *State* v. *Williams*, 94 Vt 423, 434, 111 A 701; *Gero* v. *John Hancock Life Insurance Co.*, 111 Vt 462, 473, 18 A2d 154:

*Kerr and Elliot* v. *Green Mountain Ins. Co.*, 111 Vt 502, 515, 18 A2d 164.

After Ellis had testified as a witness in his defense without objection that he did not influence or persuade Mrs. Holton to give him money at any time, and did not in any way defraud her or misrepresent to her her situation or affairs, he was asked, "Did you in any way deceive her with respect to her property, assets or money, with the intention of getting that property for yourself?", and subject to objection and exception answered that he did not. The objection was "That is a conclusion, what he said to her amounting to misrepresenting is purely a conclusion; he doesn't know whether she was deceived or not." Further than quoting this objection in his brief the plaintiff now merely says, "For self-evident reasons, this ruling was error." This is inadequate briefing, *Flint* v. *Davis*, 110 Vt 401, 404, 8 A2d 671, and merits no consideration. Reasonably interpreted the question does not ask if Mrs. Holton was deceived, but means did he do anything to deceive her. Even if it is capable of the meaning given to it by the objection it is difficult to see any prejudice because of the testimony Ellis had just given.

## EXCEPTIONS TO REFUSAL TO FIND FACTS AS REQUESTED

█ The plaintiff excepted to the failure of the chancellor to find as requested relative to the mental condition of Mrs. Holton on December 4, 1942, in four requests based upon the opinion testimony of Dr. O'Neil, who first examined Mrs. Holton on August 22, 1944. The gist of plaintiff's contention is that the subject of one's mental condition, however helpful lay opinion may be, is a field where only experts should be heard and heeded. The issue in the case was the competency of Mrs. Holton on December 4, 1942. This is not a case where a layman can have no well-founded knowledge, and where the evidence of an expert must be accepted. A non-expert witness may give his opinion as to the sanity or insanity of another, when based upon conversations or dealings which he has had with such person, or upon his appearance, or upon any fact bearing upon his mental condition, within the witness' own knowledge and observation, he having first testified to such conversations, dealings, appearance or other observed facts, as the basis for his opinion. *Foster's Exrs.* v. *Dickerson*, 64 Vt 233, 244, 24 A 253; *In re*

*Moxley's Will*, 103 Vt 100, 107, 152 A 713. This rule was approved in *Sargent* v. *Burton*, 74 Vt 24, 28, 52 A 72, a case to set aside a deed upon the ground of insufficient mental capacity of the grantor. There was evidence fairly and reasonably tending to show that Mrs. "Holton knew what she was doing and did what she intended and desired to do," and the chancellor so found, consequently these exceptions cannot be sustained. *Taylor* v. *Henderson*, 112 Vt 107, 111, 22 A2d 318.

The plaintiff excepted to the failure of the chancellor to find as requested in 9 separate particulars regarding the hallucinations or delusions of Mrs. Holton. These requests go into much more detail than finding 5 above quoted, and while the chancellor might properly have complied with them, he was not required to do so. They all relate to matters of evidence, solely for the consideration of the chancellor, and since the ultimate fact in issue was found, error does not appear in the failure to state the effect given to the subordinate facts or to report evidence. *Mount Holly* v. *Cavendish*, 92 Vt 38, 102 A 60; *In re Bugbee's Will*, 92 Vt 175, 182, 102 A 484; *Partridge* v. *Cole*, 98 Vt 373, 375, 127 A 653; *Trask* v. *Walkers Est.*, 100 Vt 51, 65, 134 A 853; *Taylor* v. *Henderson*, 112 Vt 107, 116, 22 A2d 318.

The plaintiff excepted to the failure of the chancellor to find as requested that the guardian went to the bank, presented the certificate of his appointment, and requested that the money in the account be paid to him as guardian, and that, although the passbook was in the bank, the request was refused for the alleged reason that he did not also present the passbook. This request is based upon the testimony of plaintiff Hastings, the guardian. He testified that he asked the bank "for some money to pay some bills with,". He did not testify that he asked that the money in the account be paid to him as stated in the request; hence the request was in part unsound, and it was not error to ignore the whole. *McClary* v. *Hubbard*, 97 Vt 222, 240, 122 A 469; *Peck* v. *City Trust Co.*, 104 Vt 20, 29, 156 A 403. Hastings testified that on the day before this he went to the bank, presented his certificate of appointment to Julian and learned that there was no money belonging to Mrs. Holton there. On the other hand Julian in his cross-examination by the plaintiff testified that Hastings first called at the Bank on March 3 or 4 and that the probate certificate of appointment was not given to the bank

until March 8; that when Hastings was in before he showed him the certificate and asked that it be returned to him. Then came the following:

"Q. You saw it the first time?
A. I did, yes. There is one question I would like to correct, if I may.
Q. Yes, certainly.
A. It was in regard to a safe deposit box.
Q. Yes.
A. I think Mr. Hastings asked me to check up and see whether there was a safe deposit box there at the time he first came there. I think probably I looked it up and found that there wasn't one."

Hastings was a party and an interested witness, and in view of the contradiction of his testimony by that of Julian as to what was said upon his first visit to the bank the chancellor was not bound to believe his testimony relied upon in support of the requested finding. *Nelson* v. *Travelers' Ins. Co.*, 113 Vt 86, 92, 30 A2d 75; *Scott's Exr.* v. *Beland*, 114 Vt 383, 396, 45 A2d 641. This exception is not sustained.

▆▆▆▆ As to one failure to find as requested the plaintiff in excepting merely stated: "This appears from the uncontradicted evidence." In his brief he merely says. "There was no dispute about the facts set forth in this request, and they bore strongly on the good faith of Ellis in the transaction of December 4, 1942," and refers to certain pages in the transcript. An exception to a failure to find as requested merely on the ground that it is supported by the uncontradicted evidence without pointing out why or how the facts requested are material, is not available here. *White* v. *Hight*, 112 Vt 420, 421, 422, 26 A2d 86. Neither is this exception adequately briefed. The requested finding related to matters of evidence which the chancellor was not bound to report. Furthermore, the only issue left in the case is the mental capacity of Mrs. Holton on that date, since no exception was taken to the statement in finding 12 that the chancellor failed to find that any fraudulent acts by Ellis, or undue influence on his part, prompted Mrs. Holton to create the joint account. This was equivalent to a finding that no fraudulent acts by Ellis, or any undue influence on his part,

prompted Mrs. Holton to create the joint account. *Nelson* v. *Bacon*, 113 Vt 161, 167, 32 A2d 140. Since the requested finding, in so far as any inference against the good faith of Ellis is concerned, conflicts with this finding it is immaterial, and it was not error to refuse it. *Nelson* v. *Travelers Ins. Co.*, 113 Vt 86, 99, 30 A2d 75; *Levin* v. *Rouille*, 110 Vt 126, 129, 2 A2d 196.

Another exception is to the failure to find as requested relative to what Ellis said at the conference in Campbell's office. Since there was a conflict in the evidence as to this, so that the chancellor could fairly and reasonably find to the contrary, and since the chancellor was not required to report evidence, this exception is not sustained.

Another request for a finding was complied with in part. All that is said in the brief about it is that it is based on Ellis' testimony as set forth, and that its refusal was error is too plain for argument. This is inadequate briefing and does not merit consideration. We do not search for reasons to sustain an exception.

The plaintiff duly filed 8 further requests for finding and severally excepted to the failure to find as requested. Nos. 1, 2, 3, 7 and 8 called for subordinate facts or evidence which the chancellor was not required to report. No. 4 is not supported by the evidence. The evidence is conflicting as to No. 5, No. 6 is supported only by the testimony of the plaintiff Hastings, whom, as we have stated, the chancellor was not bound to believe. These exceptions are not sustained.

### Exceptions to Findings

Exception was taken to the finding that the bank account was placed in the joint names of Mrs. Holton and Ellis with the right of survivorship, whereas the account was payable in the disjunctive, rather than the conjunctive. Mrs. Holton and Ellis signed a card directing that this account be opened in their joint names, payable to either or the survivor. The passbook was headed "In Account with Mrs. Abby T. Holton or Theodore M. Ellis." The discrepancy is immaterial since Mrs. Holton is deceased and Ellis is the survivor.

Exception was taken to that portion of finding 12, quoted in full in our statement of the case, relative to inability to find that Mrs. Holton's mental state was such that she was not appreciative

of the act she was doing when she transferred the bank account from her sole name to the joint names of herself and Ellis, on the ground that the preponderance of the evidence, by any scales justified by law, having particular reference to the uncontradicted and unimpeached expert psychiatric evidence in the case, requires a finding such as the chancellor says he is unable to find. Exception was also taken to the statement in finding 12: "On the contrary I find that on that day Abby T. Holton knew what she was doing, and did what she intended and desired to do," on the ground that this finding is not supported by the evidence, and that on the evidence in the case, especially the uncontradicted and unimpeached expert psychiatric evidence, such knowledge, intention and desire were not, nor could be found to be, the rational product of a sound mind. What we said above under the exception to the failure to find as Dr. O'Neil testified is applicable here. The whole finding shows that Dr. O'Neil's testimony was not arbitrarily disregarded as claimed in the brief.

Julian and Miss Coombs, long time acquaintances of Mrs Holton, were present when the bank account was transferred and testified to what occurred. Julian testified that Ellis and Mrs. Holton came into the bank and she said that she wanted to transfer her account to a joint account of herself and Ellis, and he told her there were two different kinds of joint accounts, one is what is called a trust account, in which a person can deposit funds which are subject to his order during his lifetime, and at death become the property of the beneficiary; or the other form of joint account which is payable to either one during his lifetime, or to the suvivor in case of death; and she said that she wanted the account made in a joint account in the name of herself and Ellis; and that he then told her that the account would be subject to her order, that is, she could withdraw the funds, or he could come in and withdraw the money at any time he saw fit, or in the event of the death of either one it would be payable to the survivor, and she said, that "is absolutely all right, that is the way I want it. I had much rather the money go to Mr. Ellis than to any one of the others who have never done anything for me." He testified that he then made out an order covering the transfer of the book in her name to a joint account and she signed it in his presence; that he then called in Miss Coombs before the new bankbook was made out, and asked Mrs.

Holton if she thoroughly understood the meaning of a joint account, and if she realized that the money was payable to her and Ellis, and that in the event of death it would be payable to either, and she said she did, and that was the way she wanted it, that she wanted Ellis to have the money; that then she and Ellis signed the joint account signature contract; that the new bankbook was then prepared and he delivered it to Mrs. Holton, and she immediately gave it to Ellis, who left it at the bank for safe keeping. Julian further testified that on this occasion he saw nothing that indicated to him that she was of unsound mind, but that she appeared absolutely normal. Miss Coombs testified to being present when Julian explained the nature of a joint account, and that Julian told Mrs. Holton that under the terms of joint accounts, the account upon the presentation of the bank book would be payable to either or the survivor, and Mrs. Holton said, "That is the way I want it." Miss Coombs was then asked if on that occasion she observed anything about Mrs. Holton which would indicate to her that she was not of sound mind, and she answered, "No." Miss Coombs further testified to an occasion on January 29, 1943, when Mrs. Holton came to the bank alone and withdrew $200.00 from this account. Willard Rutledge worked for Mrs. Holton six months afterwards, from June 21 to July 7, 1943, putting new roofing on her barn and porch. He testified to discussions about the kind of roofing, and of her asking for an estimate, and that she appeared to understand the discussion generally about the need and kind of roof he recommended, and that when she paid him she gave him some dividend checks and a Peck Company check to the amount of $120 to $121, toward his bill, and a little later paid the balance in cash and that when she gave him the checks she set them down on a piece of paper and added them up. When asked to state whether or not she was in his opinion of sound mind on the occasion he was there he replied "At times, yes, and other times I wouldn't consider her perfectly sound, kind of a childish mind, but only once." When asked about that occasion, he replied. "Well, she dressed up kind of funny and went away and was brought back home." Frank Tilton, the nephew who went to live with Mrs. Holton after his mother died, on cross-examination by the defendant testified, that except for the part of the groceries he bought she paid all the household bills, and looked after her financial affairs until the

guardian was appointed, and that she made the arrangement with Willard Rutledge for the roofing job and paid him; that the day before the bank book was transferred she told him that she wanted to go to the First National Bank, and that the next morning they came to St. Johnsbury, and she went into that bank for the purpose of going to her deposit box·there. Ellis testified on cross-examination that during all his frequent associations with Mrs. Holton, he never saw the slightest thing that suggested to him that she was not perfectly sound in her mind.

The findings have the standing of a verdict expressly approved by the trial court, and cannot be overturned merely because the evidence preponderates against them; *Schwarz* v. *Avery*, 113 Vt 175, 179, 31 A2d 916; *Cook* v. *Holden*, 113 Vt 409, 412, 35 A2d 353; *Platt, Admx.* v. *Shields*, 96 Vt 257, 271, 119 A 520. We do not weigh the evidence since its persuasive effect and the credibility of the witnesses are for the trier of fact to determine. If there is legitimate evidence fairly and reasonably tending to support the findings they must stand, and whether there is evidence of this quality and tendency is the only question here. *Schwarz* v. *Avery*, *supra*, and cases cited. We think the quoted evidence is of this quality and tendency.

### EXCEPTION TO DECREE

Under his exception to the decree no claim is made that the transfer of the bank account is to be regarded as unreasonable or unnatural, or as having been obtained by fraud or other unfairness. The only objection raised is, that the finding that Mrs. Holton knew what she was doing and did what she intended and desired to do, does not solve the determinative question, as to whether Mrs. Holton was competent to make over her bank account as was done on December 4, 1942, either expressly or by legitimate inference, and that such finding does not establish her mental soundness or capacity for rational processes.

The rule as to measure of capacity is that Mrs Holton must have had enough capacity to enable her to understand and comprehend in a reasonable manner the nature and effect of the business she was doing. *Stewart* v. *Flint*, 59 Vt 144, 152, 8 A 801. It does not follow that she did not have this capacity from the fact that she had some delusions about matters not related to property or contracts. *Willard, Adm.* v. *Dow*, 54 Vt 188, 192.

The findings show that Mrs. Holton had considerable property, and was conversant with joint bank accounts, knew how they were established, and the rights of the parties with respect to withdrawals, and that Julian informed her of the effect of the creation of the joint account here in question. She had only one near relative, an unmarried nephew, who is now her sole heir. P. L. 2966. She had been befriended by the defendant. Since doubtful findings are to be construed to support the decree, if they reasonably may be, (*Stratton* v. *Cartmell*, 114 Vt 191, 197, 42 A2d 419; *Cook* v. *Holden*, 113 Vt 409, 413, 35 A2d 353; *Campbell* v. *Ryan*, 112 Vt 238, 22 A2d 502; *Ward* v. *Lyman*, 108 Vt 464, 469, 188 A 892; *Gardner* v. *Gauthier*, 101 Vt 147, 149, 141 A 682; *Reed* v. *Hendee*, 100 Vt 351, 354, 137 A 329) we are to so read the foregoing findings and the further finding that Mrs. Holton on the day she transferred the account into the names of herself and Ellis "knew what she was doing and did what she intended and desired to do." The word "know" may mean "to have mental certitude in regard to, together with clear comprehension of," "to perceive with understanding and conviction;" "to have immediate experience of," "to be acquainted with;" "to be conversant with, to have practical knowledge of." Webster's New International Dictionary. We think that the findings may be reasonably construed as equivalent to an express finding that Mrs. Holton had enough capacity to enable her to understand and comprehend in a reasonable manner the nature and effect of the business she was doing, and will so construe them in support of the decree. This exception is not sustained.

In view of the outcome of this case, and the lack of any finding that the guardian sought to withdraw the money from the bank when the bank book was there, it was not error to grant the motion of the bank to be dismissed.

In this opinion we have discussed several exceptions to the exclusion of evidence which the plaintiff claims bore upon the good faith of Ellis in the transaction of December 4, 1942, and an exception to the admission of testimony from Ellis that he did not in any way deceive Mrs. Holton with respect to her property, assets or money, with the intention of getting her property for himself. Because of the failure to except to the finding, that the chancellor failed to find that any fraudulent acts by Ellis, or any undue influence on his part, prompted Mrs. Holton to create the joint

account, the issue of fraud and undue influence was out of the case, and the evidence excluded or received on that issue became immaterial, whether or not erroneously excluded or received.

As we have shown, a requested finding which conflicts with a finding that is not excepted to is immaterial, and it is not error to refuse it. It necessarily follows that evidence in support of such requested finding is also immaterial, and whether it was received or excluded is immaterial also. Questions relating to the tendency of the evidence, or lack of evidence, are not before us, when the findings are unchallenged. *White River Chair Co.* v. *Connecticut River Power Co.*, 105 Vt 24, 43, 162 A 859. It follows that, when a finding is unchallenged, error in the admission or exclusion of evidence relative to the subject matter of such finding is of no consequence. This rule is unlike that in cases tried by jury, where exceptions to the reception or exclusion of evidence are not waived by failure to except to the charge of the court. *Phillips Co.* v. *Gay's Express*, 112 Vt 49, 55, 20 A2d 102, and cases cited.

We have considered all of the plaintiff's exceptions, and find no error.

*Decree affirmed.*