2009 VT 11

# Carl Follo, Follo Hospitality, Inc. and Capra Real Estate, LLC v. Paul Florindo, Susan Morency, Cranberry Farm, LLC, PFSM, Inc. and Brookside Leasing

[970 A.2d 1230]

No. 07-322

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed January 23, 2009

Motion for Reargument Denied February 25, 2009

*Stephen S. Ankuda* of *Parker & Ankuda, P.C.*, Springfield, for Plaintiffs-Appellees/Cross-Appellants.

*Alison J. Bell* of *Langrock Sperry & Wool, LLP*, Burlington, for Defendant-Appellant/Cross-Appellee Florindo.

*R. Jeffrey Behm* of *Sheehey Furlong & Behm P.C.*, Burlington, for Defendant-Appellant/Cross-Appellee Morency.

¶ 1. **Burgess, J.** Defendants Paul Florindo and Susan Morency appeal from a jury verdict and judgment against them for common-law fraud and violations of Vermont's Consumer Fraud Act in connection with their sale of a bed and breakfast business. Both defendants claim that the evidence did not support the verdict, that the jury instructions regarding common law and consumer fraud were plainly erroneous, and that the trial court's decision to preclude their expert witnesses from testifying was error. Defendant Florindo also contends that it was error for the trial court to allow plaintiff's expert witness and the jury to value the two parcels of property at issue as one parcel for purposes of the damages calculation. Defendant Morency claims further that plaintiff's closing argument at trial was prejudicial and improper. We affirm on all counts.

¶ 2. Plaintiff, Carl Follo,[1] the purchaser and current operator of the bed and breakfast, cross-appeals on two issues. First, he claims error in the trial court's exclusion of punitive damages as a matter of law. Second, plaintiff argues that it was improper for the trial court to order remittitur of a portion of the jury award. We reverse the trial court's punitive-damages decision and affirm the remittitur order.

## I. Background

### A. History of the Real Estate Transactions

¶ 3. In 2000, defendants formed a Vermont limited liability company, Cranberry Farm, LLC. Defendant Morency owned 51% of the LLC and was president and treasurer while defendant Florindo owned 49% and was vice-president, secretary, and assistant treasurer of the company. Defendants created Cranberry Farm, LLC to acquire an inn in Vermont, and soon after it was formed, the company purchased an inn on twenty-seven acres of land in Rockingham, Vermont (the Inn) for $825,000. Defendants' lenders required an appraisal of the parcel, and the appraised value was the same as the purchase price. During this period, defendants also formed a second company, PFSM, Inc., to acquire personal property for the Inn and to operate it. In the same year, 2000, but acting as individuals instead of through either of their

---

[1] The two businesses Mr. Follo formed to purchase and run the Inn, Capra Real Estate, LLC and Follo Hospitality, Inc., are also named plaintiffs in this case. For convenience, we refer to plaintiffs collectively as "plaintiff" or "Mr. Follo."

companies, defendants purchased a single-family house (the Cottage) on twenty acres of land adjacent to the Inn for $175,000.

¶ 4. Over the next two years, defendants redecorated and operated the Inn while also separately renting out the Cottage. Defendants split their duties in running the Inn. Even though Ms. Morency was Cranberry Farm, LLC's President and Treasurer, Mr. Florindo handled most of the finances for the Inn, including the bookkeeping and filing tax returns. Ms. Morency's responsibilities included decorating, operating the front desk, planning private parties, and managing housekeeping and guest relations. Defendants operated the Inn for close to two years, and in the summer of 2002, defendants decided to sell the Inn and the Cottage. Defendants listed the properties with a real estate company, Hospitality Consultants. Hospitality Consultants marketed the Inn and the Cottage together in one brochure, listing the Inn for $1,195,000 and the Cottage for $225,000.

¶ 5. Around the time that defendants decided to get out of the innkeeping business, plaintiff decided to enter it. When plaintiff decided he wanted to buy a bed and breakfast, he began researching methods for evaluating inns listed for sale. During his research, plaintiff learned about a "gross revenue multiplier" approach to calculating sales prices for inns. Under this approach, a prospective buyer multiplies the inn's gross earnings by a number between three and seven to determine an appropriate sales price. Plaintiff decided he would buy only an inn that showed it was profitable, that he could acquire for a maximum of five times the inn's gross sales, and that would cost less than $1 million.

¶ 6. Plaintiff entered into negotiations to purchase defendants' Inn late in 2002. He specifically pursued the Inn, even though the listed sales price was above his $1 million limit, because the profit-and-loss statement included in the marketing brochure for the Inn showed that it was a solid business. During negotiations, plaintiff asked for and received reports, including tax returns, from defendants (via the real estate agent) on the revenues, sales, expenses, and net income of the Inn during 2001 and 2002. Relying on these reports, plaintiff used the "gross revenue multiplier" approach to calculate that the property was worth $1,130,000 by multiplying the Inn's reported 2001 sales of $226,000 by five. Plaintiff then offered $1,080,000 for the Inn. However, in order to succeed with his bid for the Inn, plaintiff felt it was

necessary to bid simultaneously on the Cottage because another bidder was prepared to make a bid on both properties at the same time. Plaintiff discussed with the real estate agent and defendant Florindo whether they thought he could raise sufficient revenue from the Cottage to cover its purchase price if he remodeled the Cottage to contain three suites, then rented those as part of the Inn business. According to plaintiff, both the real estate agent and Florindo expressed the opinion that he would "absolutely" get his money back using that plan, at least in part due to the occupancy rates and demand during certain times of the year as represented by defendants when they operated the Inn. Plaintiff purchased both the Inn and the Cottage for $1,245,000 in March 2003.[2]

¶ 7. As he began to operate the Inn during the spring of 2003, plaintiff realized that the Inn's sales for the first few months of his ownership were less than one-quarter of the sales figures he expected based on the information defendants provided prior to sale. To boost sales, plaintiff decided to try a mailing directed at the Inn's former customers and requested guest registration information from defendant Florindo. Subsequent communications between the parties led plaintiff to suspect that defendants had not truthfully represented the Inn's actual revenues and occupancy rates in the realtor's marketing brochure and the various reports and tax returns defendants provided plaintiff during sale negotiations. His exchanges with defendants eventually led plaintiff to file this lawsuit in early 2004.

### B. Procedural History

¶ 8. During discovery in this case, in late December 2006 and early January 2007, several of the parties (defendant Morency, the real estate agents, and plaintiff) agreed to an amended discovery schedule. Although defendants were already over five months late in disclosing their expert witnesses, and over two months late in deposing the experts, the stipulation would have enlarged the time

---

[2] Plaintiff sought financing for his purchase through the same bank that held the mortgages on the Inn for Cranberry Farm, LLC. The bank required plaintiff to have the properties appraised as a condition of the financing, as it had for defendants. The same appraiser who appraised the Inn for defendants in 2000 appraised the Cottage and Inn for plaintiff as a single property worth $1.25 million in 2003. The new appraisal value was thus $250,000 more than defendants paid for the Inn and the Cottage, and $5,000 more than plaintiff paid for the properties.

for defendants to take those actions. Before defendant Florindo signed the new discovery schedule, however, and before the trial court adopted it, plaintiff withdrew his stipulation and requested the trial court set a mediation and trial date. In response, defendants asked the court to allow them extra time for "discovery or disclosure of experts and the filing of dispositive pretrial motions." After the trial court held a status conference on the matter, it decided to enforce the original scheduling order, thereby denying defendants' requests to enlarge the time for them to disclose and depose their experts. The court held that defendants were prohibited from presenting any expert witnesses at trial because of their violation of the discovery schedule.

¶ 9. Plaintiff's amended complaint of August 24, 2006, stated a variety of claims against defendants as individuals and their companies, as well as against the real estate agents and their real estate corporation. After trial, but before the case went to the jury, plaintiff dropped all claims except for common law and consumer fraud claims. At the close of plaintiff's case, the parties made several motions that are relevant on this appeal. First, defendant Florindo moved unsuccessfully for judgment as a matter of law on fraud and on the benefit-of-the-bargain damages claimed by plaintiff. Second, defendant Morency moved unsuccessfully for judgment as a matter of law on the Consumer Fraud Act charges, the common-law-fraud charges, and the benefit-of-the-bargain damages. Third, the court granted defendants' motions to exclude punitive damages as a matter of law. At the close of all the evidence, defendants renewed their motions, and plaintiff objected to the trial court's decision not to allow punitive damages as a matter of law. The trial court did not change any of its rulings in response to those motions.

¶ 10. During closing arguments, plaintiff's counsel stated that the date on a certain tax return provided to plaintiff by defendants had been whited out and suggested to the jury that the whiting out was to cover up that the tax returns had not been prepared at the time defendants claimed. Defendant Morency objected to these statements, but the trial court overruled that objection and proceeded to charge the jury. After deliberating, the jury returned a verdict against defendants Florindo and Morency for common-law fraud and consumer fraud, but found in favor of the realtor and its agents. The jury awarded damages for plaintiff in the amount of $645,000.

¶ 11. Following the verdict, defendant Morency moved for judgment notwithstanding the verdict, or a new trial, on the common law and consumer fraud charges. She also moved for a new trial or remittitur of the damages award, arguing that it was excessive. As part of her damages motion, Ms. Morency also argued that it was error for the trial court to have allowed plaintiff's witness and the jury to value the Inn and the Cottage as a single property, and thus to include the value of the Cottage in the damages calculus. Defendant Florindo joined in all of defendant Morency's requests.

¶ 12. Ruling on the post-verdict motions, the trial court concluded that the jury's verdicts on common law and statutory fraud were consistent with the evidence against defendant Morency under the jury instructions given. The court noted that Ms. Morency had failed to object to the jury instructions when they were given and failed, in her post-verdict motion, to demonstrate that they were either plainly inconsistent with established law or that their application to the evidence did not support the jury's conclusion that she made fraudulent misrepresentations and committed deceptive acts under the consumer fraud statute. With respect to the damages award, the court held there was no error in allowing the Cottage and the Inn to be valued as a single property.

¶ 13. However, the trial court held that the jury's damages award was higher than it could be under the law of the case and the evidence presented by plaintiff. The court concluded that the evidence presented was sufficient to support a damages award of only $295,000. Based on this determination, the court conditionally denied defendant's motion for a new trial on damages subject to plaintiff's agreement to remit any claim of damages above $295,000. Plaintiff agreed to the remittitur, and the court entered final judgment against defendants for damages of $295,000 plus prejudgment interest, costs, and attorney's fees. Defendants appealed here and plaintiff filed his cross-appeal.

## II. Defendants' Claims on Appeal

### A. Issues Not Preserved

■ ■ ¶ 14. At the outset, we briefly address several of defendants' claims on appeal that were not properly preserved below. (Both defendants were represented by different counsel at

trial.) Defendants claim error with respect to the trial court's jury instructions on common-law fraud and consumer fraud. In general, issues not raised at trial are unpreserved, and this Court will not review them on appeal. *Deyo v. Kinley*, 152 Vt. 196, 200, 565 A.2d 1286, 1289 (1989). Regarding jury instructions in particular, Rule 51 states "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." V.R.C.P. 51(b). Further, in order to preserve a jury-instruction issue for appeal, the parties must renew any objections made during charge conference after the court instructs the jury. *Foster v. Bittersweet Experience, Inc.*, 173 Vt. 617, 618, 796 A.2d 483, 486 (2002) (mem.). In this case, none of the defendants objected to any jury instruction after the jury charge, despite the trial court's invitation to do so at a bench conference following the jury charge. Consequently, these claims are waived on appeal. *Imported Car Ctr., Inc. v. Billings*, 163 Vt. 76, 80, 653 A.2d 765, 769 (1994).

■ ■ ¶ 15. Defendants raise two other issues on appeal that were not preserved at trial. Defendant Florindo claims it was error to allow plaintiff's expert appraiser to value the Inn and Cottage as a single property. However, Mr. Florindo failed to object when the witness testified, or at any other point during the trial; consequently, we will not review this issue. *Deyo*, 152 Vt. at 200, 565 A.2d at 1289. Defendant Morency claims that we should find reversible error in plaintiff's counsel's closing argument. She contends that plaintiff repeatedly used an improper "send a message" argument that prejudiced the jury. Once again, defendant attempts to raise a claim not preserved. Defendant Morency's only objection before the trial court to plaintiff's closing argument related to a comment about the white-out on the tax return; she never raised the "send a message" argument. Thus, we will not review this issue, either. *Id.*

■ ■ ¶ 16. Defendants seek to avoid application of Rule 51 and our associated case law requiring preservation below by arguing that the errors claimed amount to "plain error."[3] We decline to so find. While we do not read Rule 51 as absolutely precluding

---

[3] In their briefing, defendants cite Federal Rule of Civil Procedure 51(d)(2) as authority for their position that plain error review is appropriate to examine unpreserved issues regarding jury instructions. Indeed, that provision of the

plain-error review, this Court considers plain error in civil cases only in limited circumstances, i.e., when an appellant raises a claim of deprivation of fundamental rights, *Varnum v. Varnum*, 155 Vt. 376, 382-87, 586 A.2d 1107, 1110-13 (1990) (applying plain-error review where mother claimed violations of her federal and state constitutional rights to the free exercise of religion in parental rights-and-responsibilities proceeding), or when a liberty interest is at stake in a quasi-criminal or hybrid civil-criminal probation hearing, *State v. Decoteau*, 2007 VT 94, ¶ 11, 182 Vt. 433, 940 A.2d 661. Such circumstances are not present here.

## B. Expert Witnesses

¶ 17. Defendants next argue that the trial court abused its discretion when it upheld the original scheduling order for discovery in this case and precluded defendants from presenting any expert witnesses at trial. The trial court's ruling was prejudicial, according to defendants, because expert testimony about the subject property's value was essential in this case. Defendants maintain that plaintiff's fraud suit was predicated entirely on the claim that plaintiff was induced to pay more than market value for the property. Further, defendants posit that their expert testimony regarding property value was necessary because the court relied on plaintiff's expert's testimony as to the property's value to determine the appropriate damage award. In sum, defendants claim they were prejudiced because, had they been allowed to present their own expert testimony regarding property values, they might have persuaded the jury or the court either that no fraud occurred or that a lesser damage award was appropriate.

¶ 18. The trial court made its exclusionary ruling in response to defendants' attempt to amend the court-ordered discovery schedule. The original schedule, ordered in May 2006, required plaintiff to make expert disclosures by June 15, defendants to make their expert disclosures by July 15, and for the parties to complete all

---

federal rule specifically authorizes "plain error" review of unpreserved jury instruction issues if the issue "affects substantial rights." F.R.C.P. 51(d)(2). That provision of the federal rule was adopted in 2003, Advisory Committee Notes, 2003 Amendments, F.R.C.P. 51, but Vermont has not adopted a similar provision. Cf. V.R.C.P. 51. Our interpretation of Vermont Rules of Civil Procedure is often guided by federal precedent on identical federal rules. See, e.g., *Salatino v. Chase*, 2007 VT 81, ¶ 7, 182 Vt. 267, 939 A.2d 482. Given our case law to the contrary, see *supra*, ¶ 16, however, we are not persuaded to apply the federal rule to a state case where our rule does not have a similar provision.

discovery by October 1, 2006. See V.R.C.P. 26(f) (the trial court "shall enter an order . . . establishing a plan and schedule for discovery, setting limitations on discovery . . . as are necessary for the proper management of discovery in the action"). Plaintiff named his expert witnesses by his deadline, but defendants' deadline passed without their required disclosure. By the time these issues were presented to the trial court, in January 2007, six months had passed from the time defendants were supposed to have disclosed their expert witnesses, and they still had not done so.

¶ 19. The trial court's rulings on the admission or exclusion of evidence are discretionary. *Boehm v. Willis*, 2006 VT 101, ¶ 12, 180 Vt. 615, 910 A.2d 908 (mem.). We will not disturb a discretionary ruling "unless it is shown that such discretion was abused or entirely withheld," *Poplaski v. Lamphere*, 152 Vt. 251, 255, 565 A.2d 1326, 1329 (1989), and the abuse of discretion resulted "in prejudice to [a party's] substantial rights." *Boehm*, 2006 VT 101, ¶ 12 (internal quotations omitted); V.R.C.P. 61 ("No error in either the admission or the exclusion of evidence . . . is ground for granting a new trial or for setting aside a verdict or for . . . otherwise disturbing a judgment . . . unless refusal to take such action appears to the court inconsistent with substantial justice."). The trial court's decision to preclude defendants' use of expert witnesses was an appropriate exercise of the court's discretion.

¶ 20. In an analogous case, where a party moved to extend the time for depositions three days *before* the discovery schedule's deadline for depositions, the trial court denied the party's motion and subsequently entered summary judgment against her. *Poplaski*, 152 Vt. at 254, 565 A.2d at 1328-29. We affirmed the trial court's decision there, holding that "sixteen months between the filing of the complaint and the summary judgment hearing," and eight months between the date of the discovery schedule order and the deadline for the depositions, allowed the plaintiff sufficient time to take any depositions she thought were necessary. *Id.* at 255, 565 A.2d at 1329. Here, defendants did not attempt to extend the time for expert witness disclosure until five months *after* the deadline for those disclosures (and two months *after* the deadline for completion of all discovery) had passed. In total, the discovery schedule gave defendants over two years from the time plaintiff filed his claim, and two months from the date of the discovery schedule order, to the deadline for expert disclosures.

■ ¶ 21. The burden of disclosing experts is not a heavy one and if, as defendants now claim, "expert testimony was crucial" in this case, they were offered sufficient time to obtain and disclose experts under the original discovery schedule. Defendants offer no reasons or excuse for their failure to disclose experts within the time given under the original schedule or for their decision not to move for an extension of time before their discovery deadline passed. Accordingly, we do not see how the trial court's order prohibiting defendants from presenting expert testimony at trial was an abuse of discretion or "inconsistent with substantial justice." V.R.C.P. 61.

## C. The Consumer Fraud Act Claims

■ ¶ 22. Turning to defendants' arguments that the evidence did not support the verdicts against them on the Consumer Fraud Act (CFA) counts, we disagree. Defendants moved for judgment as a matter of law on these issues at trial and after the trial court entered judgment against them. On appeal, defendants' arguments regarding the sufficiency of the evidence are intertwined with their arguments that the jury instructions were erroneous. Because we will not review the jury instructions, see *supra*, ¶¶ 14, 16, we will not consider any alleged errors in the jury instructions as bearing on the sufficiency of the evidence to support the verdicts. Instead, we take the jury instructions as the governing law of the case. *Lemnah v. Am. Breeders Serv, Inc.*, 144 Vt. 568, 573, 482 A.2d 700, 703 (1984).

■ ¶ 23. For different reasons, both defendants failed to comply with the procedural requisites of Rule 50 in moving for judgment as a matter of law on consumer fraud, and thus we cannot review their CFA issues on appeal. Defendant Florindo failed to move in the first instance for judgment as a matter of law on the CFA claim; thus, we will not review this claim on appeal. *Stacy v. Merchants Bank*, 144 Vt. 515, 519, 482 A.2d 61, 63 (1984). Defendant Morency, in contrast, did properly preserve her Rule 50 motion by moving for judgment as a matter of law at the close of all the evidence and after judgment was entered against her. On appeal, however, Ms. Morency argues for the first time that the evidence was insufficient to support the CFA verdict because plaintiff did not prove that he was a consumer, or that defendants were sellers, within the meaning of the CFA.

¶ 24. Defendant Morency acknowledges in her brief that the jury instructions on the CFA charge stated that plaintiff established that he was a consumer as a matter of law. The instructions did not state the CFA definition of seller nor did they state that plaintiff had the burden of establishing that defendants were sellers in order to prevail on his CFA claims. As we noted above, defendant failed to object to these instructions. Consequently, these CFA issues are not preserved for appeal. *Foster*, 173 Vt. at 618, 796 A.2d at 486. Thus, even though Ms. Morency may have preserved an opportunity to appeal on the sufficiency of the CFA evidence as she raised the argument at trial, her new argument on appeal, on different issues, was not preserved. As discussed above, this civil case will not be reviewed for plain error. Accordingly, we will not review Ms. Morency's fresh CFA challenge on appeal.

### D. The Common-Law Fraud Claims

¶ 25. We turn now to defendants' contests of their common-law fraud liability. Defendant Morency moved for judgment as a matter of law on the common-law fraud count both at the close of the evidence and after the verdict was entered against her. However, defendant Florindo made a motion for judgment as a matter of law regarding the common-law fraud charge only at the close of the evidence, and not after the jury returned its verdict. Although defendant Florindo attempted to join his co-defendant's post-verdict motion, the trial court pointedly refused to consider Mr. Florindo's challenges to the sufficiency of the evidence against him because instead of briefing the issues himself, Mr. Florindo simply claimed to join in all of his co-defendant's requests without additional briefing. Defendant Morency's motion, however, expressly argued that her actions must be distinguished from those of Florindo. Accordingly, the trial court decided not to discuss in any depth the sufficiency of the evidence to establish fraudulent conduct by Mr. Florindo, as he failed to allege or brief why the jury's verdicts against him on those issues were contrary to the evidence. Given this context, we consider only Mr. Florindo's motion for judgment as a matter of law made at the close of the evidence. *Lussier v. N. Troy Eng'g Co.*, 149 Vt. 486, 489, 544 A.2d 1173, 1176 (1988).

¶ 26. Motions for judgment as a matter of law made before the case is submitted to the jury and those made after the verdict is

returned "raise substantially the same legal questions . . . and are treated alike." *Center v. Mad River Corp.*, 151 Vt. 408, 413, 561 A.2d 90, 93 (1989). The substantive standards governing our review of judgments as a matter of law are familiar. "We review judgment as a matter of law under the same standard as the trial court . . . ." *Gero v. J.W.J. Realty*, 171 Vt. 57, 59, 757 A.2d 475, 477 (2000). We consider the evidence in the light most favorable to the nonmoving party, excluding the effect of any modifying evidence. *Id.* "Modifying evidence is that evidence which the jury is free to disbelieve because of questions about its credibility." *Monahan v. GMAC Mortgage Corp.*, 2005 VT 110, ¶ 2, 179 Vt. 167, 893 A.2d 298.

¶ 27. Rule 50 motions are granted only where there is "no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party." *Schaad v. Bell Atlantic NYNEX Mobile, Inc.*, 173 Vt. 629, 631, 800 A.2d 455, 457 (2002) (mem.) (quotations omitted). "Plaintiffs are entitled to every reasonable inference that may be drawn from the evidence." *Lockwood v. Lord*, 163 Vt. 210, 212, 657 A.2d 555, 557 (1994). We affirm the trial court's denial of a motion for judgment as a matter of law as long as the "evidence fairly or reasonably supports a lawful theory of the nonmoving party." *Northshire Commc'ns, Inc. v. AIU Ins. Co.*, 174 Vt. 295, 299, 811 A.2d 216, 219 (2002). Additionally, if a jury verdict "is justified by 'any reasonable view of the evidence, it must stand.'" *Claude G. Dern Elec., Inc. v. Bernstein*, 144 Vt. 423, 426, 479 A.2d 136, 138 (1984) (quoting *Crawford v. State Highway Bd.*, 130 Vt. 18, 25, 285 A.2d 760, 764 (1971)).

¶ 28. The sufficiency of the evidence for common-law fraud against each defendant is evaluated under the law of the case. The trial court's instructions on common-law fraud stated, in relevant part:

> In order to prove fraud, plaintiffs must demonstrate by clear and convincing evidence each of the following essential elements. One, that defendants misrepresented an existing fact which affected the essence of the transaction with plaintiffs or knowingly allowed another to make such a representation on defendants' behalf; two, that defendants did so intentionally; three, that the misrepresentation was false when made and known at the time to be false by a defendant, or that the representa-

tion was recklessly made as being within the defendants' own knowledge without defendant in fact knowing whether it was true or not.

Both defendants argue that they were entitled to judgment as a matter of law on common-law fraud mainly because they claim there was insufficient evidence to show that they knew their misrepresentations were false when made. The jury instructions allow a fraud verdict both for defendants' actual knowledge of the falsity of their representations and for recklessly making misrepresentations without actual knowledge. To evaluate whether the evidence fairly and reasonably supports the jury's fraud verdict, it is helpful to flesh out the meaning of "recklessly" in the context of common-law fraud.

¶ 29. Fraud exists not only when speakers knows their statements are false, but also when the statements are "made in such a reckless manner that the law will presume them to be made with knowledge." *Town of Townshend v. Howard's Estate*, 94 Vt. 215, 217, 109 A. 903, 904 (1920); see also *Bennington Housing Auth. v. Bush*, 2007 VT 60, ¶ 9, 182 Vt. 133, 933 A.2d 207 (fraud can consist in making a false statement "with reckless indifference as to its truth") (quotation omitted).

¶ 30. The Restatement (Second) of Torts provides guidance on this issue. According to the Restatement, an actual fraudulent representation occurs when a person misrepresents a fact in a way that "assert[s] that the maker knows it" to be so, but in fact "has merely a belief in its existence and recognizes that there is a chance . . . that the fact may not be as it is represented." Restatement (Second) of Torts § 526 cmt. e (1977). Fraud perpetrated in this manner is characterized as a "false representation . . . made . . . *recklessly*" because the person making the misrepresentation asserts something as fact regardless of "whether it is true or false." *Id.* (emphasis added). Additionally, when someone makes a false representation of fact and expressly states that it is based upon the

> maker's personal knowledge of the fact in question or even upon his personal investigation of the matter. . . . [or] though not expressly so stated, the representation [is] made in a form or under such circumstances as to imply that this is the case. . . . [then the] misrepresen-

tation so made is fraudulent even though the maker is honestly convinced of its truth from hearsay or other sources that he believes to be reliable.

*Id.* cmt. f. These two comments explain situations where actual fraud lies even when there is no proof that the reporter of a material fact has actual knowledge of the falsity of the representation. See also *Powell v. D.C. Hous. Auth.*, 818 A.2d 188, 197-98 (D.C. 2003) ("To find that a misstatement was made with knowledge of its falsity, the person accused . . . must be found to have known that the statement was false, or to have made that statement with reckless indifference as to its truth."); *Jacobs v. Dist. Unemployment Comp. Bd.*, 382 A.2d 282, 287 (D.C. 1978) (stating "the knowledge required for fraud does not necessarily mean actual knowledge of falsity; the scienter element is satisfied if the representation is recklessly and positively made without knowledge of its truth" (quotations omitted)). These explanations are consistent with the trial court's jury instruction, and we hold that there was sufficient evidence for a reasonable jury to find that defendants committed fraud under the actual knowledge and the reckless standard.

¶ 31. Taking the evidence in the light most favorable to the jury's verdict and to plaintiff, the following facts were established at trial. Plaintiff's decision to buy the Inn and Cottage for $1,245,000 was founded in large part on his belief that the Inn generated certain levels of revenue and maintained certain occupancy rates during the years of defendants' operation. Plaintiff's beliefs on these subjects came from several documents that were either created by defendants or by third parties based on information that defendants provided. One of the documents was the brochure produced by the real estate agency, misrepresenting the Inn's profits and losses, occupancy information, and room rates for 2001. Another document was a separate profit-and-loss statement for the Inn for 2002, which the real estate agent provided plaintiff. The real estate agent also provided plaintiff with Cranberry Farm, LLC's 2001 income tax return. These documents indicated that the Inn had over $226,000 in gross revenue in 2001 and over $250,000 in gross revenue in 2002. In discussions with the real estate agency, plaintiff was told that those numbers represented the Inn's revenues without including the additional nine percent rooms-and-meals tax. At trial, the real estate agents testified that all of the financial information about

the Inn that they presented to plaintiff came from defendants, although their direct dealings were with defendant Florindo.

¶ 32. Data gathered by plaintiff after he purchased the Inn, and in discovery after commencing this lawsuit, contradicted the representations contained in the brochure, the profit-and-loss statements, and the 2001 tax return. Before filing this suit, plaintiff obtained from defendants the original guest-information forms defendants kept for the Inn's 2002 reservations, which revealed the actual room sales for 2002 amounted to only about one-fifth of the sales defendants claimed in the 2002 profit-and-loss statement provided to plaintiff via the real estate agency. During discovery, plaintiff received defendants' room-assignment book for August 2002 through January 2003. According to defendants' bookkeeping system, the guest-information forms and room-assignment book should have contained duplicative information regarding room sales and occupancy. However, trial testimony by both plaintiff and defendant Morency revealed that the guest-information forms, which defendants had provided plaintiff before this lawsuit was commenced, listed many customers not corroborated by the room assignment book. As noted above, even the occupancy rates culled by plaintiff from the guest-information forms fell far short of the occupancy rate represented in the documents provided by defendants before plaintiff purchased the Inn.

¶ 33. Other documents contradicted defendants' representations to plaintiff prior to purchase. An audit of defendants' tax and bank records, obtained in discovery, documented far less income than the approximately $226,000 and $250,000 represented in defendants' disclosures to plaintiff prior to the sale of the Inn. The Inn's tax returns indicated room sales of just over $54,000 in 2001 and a little more than $49,000 in 2002. All of the Inn's bank deposits for the relevant years showed the Inn's 2001 total sales at about $88,000 and their 2002 sales at just under $110,000. Plaintiff's evidence of misrepresentation was ample.

¶ 34. Moreover, Mr. Florindo's testimony supplied evidence that his misrepresentations were knowingly or recklessly made. The trial court found that Mr. Florindo's testimony could be construed as unresponsive or evasive by a reasonable jury. The court concluded that a reasonable jury could imply from this evasiveness that defendant Florindo intentionally falsified the figures shared with plaintiff. Additionally, the court concluded that even if the

jury would not find that Mr. Florindo was being evasive or that he had provided false numbers intentionally, the jury could believe that it was reckless for him to provide the revenue numbers for potential buyers of the property given how little understanding he claimed to have about the revenues and sales, and how little data and supporting evidence he could provide for those numbers.

¶ 35. Our review of the record supports the trial court's characterization of Mr. Florindo's testimony. Asked questions about his recordkeeping and how he had developed the Inn's sales and revenue numbers, Mr. Florindo repeatedly responded that he could not remember, had no recollection, or did not understand the question. He also testified that he no longer possessed records that plaintiff was seeking because they were stolen from a storage unit he had rented. He could not explain why the information that he provided the real estate agent on 2001 room sales reported about two to four times greater sales than he had deposited in the Inn's sole bank account or reported to the state for purposes of the rooms-and-meals tax. Further, defendant Florindo could not explain how he calculated 2002 room sales for the reports he sent to the real estate agent, even though he stated that he knew the room-sales records would be used to market the Inn to potential buyers.

¶ 36. In another set of questions, plaintiff asked defendant Florindo to explain why he had filed a 2002 income tax return that reported gross receipts of less than $150,000 for the Inn even though defendants had given plaintiff a 2002 financial statement for Cranberry Farm, LLC showing that the company had sales of about $250,000 for that year. Although Mr. Florindo claimed the tax return was erroneous because it did not include the last few months of sales for that year, he admitted that after he talked to his tax preparer about this alleged error, the tax preparer decided the tax return did not need to be corrected. From this testimony, a reasonable jury could conclude that there was no mistake in the 2002 tax return, and that Mr. Florindo had thus intentionally or knowingly provided a false financial statement to plaintiff showing $250,000 in sales for 2002 when the true sales for the Inn amounted to less than the $150,000 shown on the 2002 income tax return.

¶ 37. These examples are illustrative of the full scope of Mr. Florindo's responses to a lengthy and detailed examination by plaintiff regarding sales and revenue for the Inn. We conclude that

a reasonable jury could have found defendant Florindo's claims of innocent ignorance or mistake incredible in light of the fact that he had been a self-employed businessman for approximately thirty years before purchasing the Inn (owning rental property with Ms. Morency and working as a self-employed contractor). We agree with the trial court that, based on his testimony, there is clear and convincing evidence to support finding that Mr. Florindo at least recklessly disregarded the truth to a level amounting to fraud when he made these statements regarding the Inn's sales, occupancy, and revenues.

¶ 38. Ms. Morency argues that all of the trial testimony, including that of plaintiff's and her co-defendant's, revealed that she, personally, never made any representations to plaintiff regarding the Inn's finances. She notes that there was no evidence that she communicated any financial information about the Inn to the real estate agents who marketed the Inn and Cottage to plaintiff. Further, Ms. Morency claims that she never knew that the companies' tax returns contained any inaccuracies or that defendant Florindo provided the tax returns to the real estate agents for use in marketing the Inn. Ms. Morency argues that all of this evidence shows that she did not take any actions that could be considered fraudulent and that she did not have the requisite knowledge of the misrepresentations of the Inn's finances made to plaintiff to be liable for fraud.

¶ 39. We agree that the record does not reveal any evidence that Ms. Morency made misrepresentations directly to plaintiff or directly to the real estate agents, as Mr. Florindo did. Instead, the evidence of fraud by defendant Morency subsists in her documented involvement in the companies and the business of operating the Inn and in her trial testimony. Ms. Morency was the majority owner of Cranberry Farm, LLC, was both president and treasurer of that company and co-director of PFSM, Inc. with defendant Florindo, as well as the long-term girlfriend and business associate of Mr. Florindo. She had owned rental property in Massachusetts with defendant Florindo prior to their buying the Inn and Cottage, and at the time of trial she still owned excavating equipment that she leased to Mr. Florindo.

¶ 40. Ms. Morency testified at trial that she did not take part in paying the Inn's bills and that she had little to do with the Inn's operation. However, in response to questions, she revealed that she had written many checks to pay for materials to renovate the

Inn, to pay expenses, and to pay for the mortgages on the Inn and the Cottage. She also testified that she did not review the Inn's finances or tax returns, but acknowledged that she was the person who signed the companies' tax returns. Ms. Morency admitted that by signing the returns she was declaring that she had examined the return and that it was "true, correct and complete." Nonetheless, she maintained that she never looked at any of the numbers on those returns. Even if the jury believed Ms. Morency that she had no idea whether the figures in the tax returns were accurate, it could have found that, by swearing to the information in the tax returns without knowing whether those returns were true or accurate, defendant Morency made false statements "recklessly" without regard to "whether [they were] true or false." Restatement (Second) of Torts § 526 cmt. e. That level of knowledge is sufficient for fraud.

¶ 41. Additionally, the guest-information forms and room-assignment book that plaintiff introduced at trial were filled out, for the most part, in Ms. Morency's handwriting. Even though she had filled out those forms, she could not explain why the 2002 guest-information forms contained many customer names and reservations that never appeared in the corresponding room-assignment book. This provides sufficient information for a reasonable jury to conclude that defendant Morency made misrepresentations by aiding in supplying false statements of occupancy rates to plaintiff while he was deciding to purchase the Inn.

¶ 42. All of these facts, coupled with her close relationship with Mr. Florindo, provide a sound basis for the jury to have concluded that Ms. Morency was enmeshed in the companies, the Inn's operation, and in Mr. Florindo's decision-making. Further, the trial provided sufficient clear and convincing evidence that Ms. Morency knowingly or recklessly made false statements regarding the Inn's occupancy and revenues, which plaintiff relied on in purchasing the Inn. Although she testified that she had no idea that Mr. Florindo supplied the false documentation to plaintiff, a reasonable jury simply could have discredited her testimony, under the circumstances, as a false, and inculpatory, protestation of innocence. "It needs no citation of authorities to the proposition that the credibility of the witnesses is for the jury." *Smith v. Grove*, 119 Vt. 106, 114, 119 A.2d 880, 885 (1956). Not only did the jury find Ms. Morency's testimony unconvincing here, but the trial

court upheld the jury's verdict after she renewed her motion for judgment as a matter of law.

¶ 43. In sum, given the jury instructions and the totality of the evidence presented at trial, there is no basis for reversing the jury's verdict or ordering a new trial as a matter of law. Coupling her trial testimony with her background and experience with the Inn and Mr. Florindo, there is sufficient evidence to support the jury's verdict that defendant Morency participated in the fraud. The evidence fairly and reasonably supports the charges of common-law fraud against both defendants.

### III. Plaintiff's Issues on Cross-Appeal

### A. Punitive Damages

¶ 44. At trial, defendants successfully moved for judgment as a matter of law on the issue of punitive damages. Relying mainly on our analysis in *Brueckner v. Norwich University*, 169 Vt. 118, 730 A.2d 1086 (1999), the trial court held that the evidence presented against defendants could not support sending a punitive damages instruction to the jury. *Brueckner*, in line with our precedents addressing the issue of punitive damages, "limit[s] the availability of punitive damages to cases where the evidence shows that 'defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime.'" *Monahan*, 2005 VT 110, ¶ 55 (quoting *Brueckner*, 169 Vt. at 129, 730 A.2d at 1095). We require a showing that defendants acted with actual malice before we allow the issue of punitive damages to go to a jury. *Id.* Malice is not established by proof of "intentional, wrongful, [or] even illegal conduct" alone; it requires, additionally, proof sufficient to "support[] an inference of 'bad motive.'" *Id.* ¶ 56 (quoting *Brueckner*, 169 Vt. at 132, 730 A.2d at 1097).

¶ 45. While the prerequisites for imposing punitive damages in tort actions are demanding, our cases indicate that when defendants have been found liable for common-law fraud, it is proper to put the issue of punitive damages to the jury. *Proctor Trust Co. v. Upper Valley Press, Inc.*, 137 Vt. 346, 354, 405 A.2d 1221, 1226 (1979). *Proctor Trust's* facts are similar to those in the present case. There, a jury found that a seller of a printing business was liable for fraud for providing the buyers with statements and projections of the business's income that were, as

we said, "highly misleading." When the seller appealed, the buyer cross-appealed on several issues, including the trial court's refusal to send the issue of punitive damages to the jury. *Id.* at 349, 405 A.2d at 1223. We remanded the case on a different issue, but "for the guidance of the trial court," we reached the legal issue of whether punitive damages were available, and held that

> [a]ctual fraud is accomplished with an evil intent, and if a jury finds that actual fraud was committed, an injured party is entitled to have the jury consider punitive or exemplary damages. It was error for the trial court to take the issue of punitive damages from the jury's consideration.

*Id.* at 354, 405 A.2d at 1226 (citation omitted). We distinguished "actual fraud" from "constructive fraud" in *Proctor* because the buyers had also claimed error in the trial court's decision not to instruct the jury on constructive fraud, and there was thus a question as to whether the evidence on remand would support actual as opposed to constructive fraud. *Id.* That question does not arise in this case, and our conclusion in *Proctor Trust* regarding actual fraud and punitive damages governs our decision here. The issue of punitive damages should have been put to the jury.

¶ 46. From the trial court's decision in the present case, it is clear that confusion exists surrounding the preconditions for imposing punitive damages in tort cases. For this case, the importance lies in distinguishing actual common-law fraud cases, such as the present case, from other cases where we have held that the evidence of tortious conduct did not rise to a level sufficient to support a punitive-damages charge. *Proctor Trust* demonstrates that actual common-law fraud, as opposed to other kinds of intentional torts, inherently possesses the necessary malice and ill will that may make punitive damages appropriate. Merely intentional, but nonfraudulent torts, by contrast, can be performed without the tortfeasor acting maliciously. Thus, the particular intentional tort for which a party is liable is one of the integral issues in determining whether punitive damages are appropriate.

¶ 47. Neither of the cases relied on by the trial court here, *Brueckner* and *Monahan*, were actual fraud cases, and neither involved direct intentional wrongdoing. At issue in *Brueckner* was Norwich University's vicarious liability for intentional torts per-

petrated by the university's upperclassmen on the plaintiff and its direct liability for negligent supervision of those upperclassmen. While under some fact scenarios, a defendant in the university's position might have acted so outrageously that punitive damages would be appropriate, we held that the proof against the university more closely approximated negligence than malice, and thus punitive damages were not appropriate. *Brueckner*, 169 Vt. at 132, 730 A.2d at 1097.

¶ 48. *Monahan* involved a breach of the duty of good faith and fair dealing, based on a breach of contract and what this Court characterized as "negligent indifference," and that opinion alludes to our rule that intentionally fraudulent torts inherently possess the malice upon which punitive damages depend. We held in *Monahan* that the standard for breaching the duty of good faith and fair dealing falls below the level of conduct that evidences "the personal ill will, or . . . the bad motive associated with malice." 2005 VT 110, ¶ 60. Part of our decision that the defendant's breach of the duty of good faith and fair dealing in *Monahan* was not malicious involved rejecting the plaintiff's argument that the defendant's agents had acted fraudulently. Importantly, we noted in *Monahan* that "[a] sufficient showing of fraudulent conduct can satisfy the actual malice requirement for punitive damages." *Id.* ¶ 66 (citing *Ainsworth v. Franklin County Cheese Corp.*, 156 Vt. 325, 332, 592 A.2d 871, 874 (1991)). Indeed, even in a breach of contract case, where punitive damages are "generally not recoverable," we have allowed punitive damage awards when the breach takes on the "character of a . . . fraudulent tort." *Appropriate Tech. Corp. v. Palma*, 146 Vt. 643, 647, 508 A.2d 724, 727 (1986) (quotation omitted). These cases, by allowing punitive damages where actions have the character of fraud, even though actual fraud does not exist, indicate that the fraudulent torts contain the requisite actual malice for a punitive damages award.

¶ 49. Because the jury in the present case found defendants liable for actual common-law fraud, an intentional act with a specific intent to defraud the buyer, the trial court erred in not sending the issue of punitive damages to the jury.

## B. Remittitur

¶ 50. The final issue before us is plaintiff's cross-appeal on the issue of whether it was appropriate for the trial court to have

ordered either remittitur of part of the jury's damages award or a new trial. Under V.R.C.P. 59(a), if the trial court's only ground for ordering a new trial is that the jury's damage award is excessive, it may not order a new trial unless it first gives the "prevailing party . . . an opportunity to remit such portion thereof as the court deems to be excessive." Here the trial court concluded that the jury's damages award of $645,000 was excessive because it was far higher than any amount that the jury could have calculated based on the jury instructions. Consequently, the court gave plaintiff the option of accepting a remittitur of any damages above $295,000 or a new trial. While a party who accepts a remittitur, as plaintiff did here, may not then appeal it directly, it may cross-appeal on that issue if the opposing party appeals on other issues. *Brault v. Flynn*, 166 Vt. 585, 586-87, 690 A.2d 1365, 1366-67 (1996) (mem.). As thus allowed in response to defendants' appeal, plaintiff now argues that the court's order of remittitur was error because the jury's award was consistent with the jury instructions on damages and with the evidence presented at trial.

¶ 51. In this case, the jury was instructed that it could measure damages either by "the difference between the purchase price paid by Plaintiffs and the actual fair market value of the business as it existed at the time of any fraudulent . . . misrepresentations or deceptive statements" or by the benefit-of-the-bargain measure. The benefit-of-the-bargain measure of damages was defined as the "amounts [plaintiff] believe[s] the business would have generated in profit had the income and expenses been as represented by Defendants." The trial court explicitly stated that the jury could award damages under only one of these measures, not both. Again, neither party objected to these instructions after they had been given, although, as noted, *supra*, ¶ 9, defendants had objected to the benefit-of-the-bargain instruction at the close of the evidence.

¶ 52. There was arguably evidence to support either approach. The jury had before it plaintiff's purchase price of $1,245,000, and plaintiff's expert witness's market price appraisal of the property of $950,000. Also for the jury's consideration was evidence of the revenues and profit-and-loss statements that defendants presented to plaintiff before plaintiff purchased the property, and the evidence of the profits actually produced by the property under defendants' ownership.

¶ 53. At closing, however, not relying on this evidence, plaintiff argued instead that he would have paid only $600,000 for the Inn

had he known the Inn's actual revenue figures. This argument arose from plaintiff's own purchasing guidelines employed when shopping for a bed and breakfast, specifically the "gross revenue multiplier" approach to valuing businesses. See *supra*, ¶¶ 5-6. Plaintiff stated he would have paid, at most, $600,000 for the Inn because that amount was just over five times the Inn's actual gross revenues, as calculated by plaintiff's accountant, for the last full year of defendants' ownership. Plaintiff argued to the jury for a recovery of the difference between the $1,245,000 purchase price and the "gross revenue multiplier" figure of $600,000.

¶ 54. The jury returned damages for plaintiff in the amount of $645,000, which is the exact difference between plaintiff's actual purchase price and his hypothetical purchase price using the "gross revenue multiplier." The trial court granted defendants' motion for remittitur because it concluded that this award had no basis in the court's jury instructions on damages, and that the "gross revenue multiplier" approach was not an accepted method for calculating damages. It also noted that the benefit-of-the-bargain instruction focused on profits plaintiff would have received, not revenues, and that the "gross revenue multiplier" approach was focused wholly on revenues. Determination of loss, or damages, cannot be achieved by measuring revenue alone. The trial court explained that plaintiff did not make any "effort to demonstrate from the evidence how they had realized smaller profits than they reasonably ought to have expected given the deceptive representations." Further, plaintiff had not even offered evidence regarding his actual revenues. Thus, there was no basis for the jury to measure benefit-of-the-bargain damages based on plaintiff's case. It was equally evident that the $600,000 figure was not a reasonable fair market value of the property in light of plaintiff's own expert's appraisal value of $950,000. The trial court noted, reasonably, that it was "inconceivable" that defendants would have accepted an offer of $600,000 given plaintiff's own expert appraisal of the property at the time of trial. For these reasons, the trial court determined that the jury's award was excessive and that "the only fair measure of damages which the jury could have assessed" was the difference between the purchase price and the properties' fair market value as presented by plaintiff's expert appraiser, which difference was $295,000.

¶ 55. "Remittitur is within the sound discretion of the trial court, and its ruling will not be set aside on appeal absent abuse

of discretion." *Lent v. Huntoon*, 143 Vt. 539, 553, 470 A.2d 1162, 1172 (1983). Considering the trial court's close examination and analysis of the jury instructions, the jury's damages award, and the evidence presented at trial, we cannot say that it abused its discretion here. The jury's award far exceeds the amount it could have calculated based on market value and purchase price, and, as the trial court stated, plaintiff gave the jury no basis to find that the Inn would have generated profits of $645,000 more than it did had the business' income and expenses been as defendants represented them.

■■ ■■ ¶ 56. We also hold that the remittitur amount ordered by the trial court was appropriate. "The size of the remittitur is the amount needed to eliminate the excess damages in the jury's verdict." *Haynes v. Golub Corp.*, 166 Vt. 228, 240, 692 A.2d 377, 384 (1997). Given the evidence presented, $295,000 was the maximum amount that the jury could have awarded in damages here (absent the punitive damages instruction). That amount is the difference between plaintiff's purchase price and his expert witness's property appraisal value. The trial court emphasized that plaintiff never attempted to prove a shortfall in expected profits in order to secure benefit-of-the-bargain damages, and instead argued only the "gross revenue multiplier" theory to the jury. Since that theory is not an accepted measure of benefit-of-the-bargain damages, the difference between purchase price and market value is the only evidence on which any jury could have based a damages award. Given that plaintiff's expert was the same appraiser who valued the property for the bank both when defendants bought it and when plaintiff bought it, *supra*, n.2, there is every reason to believe that his valuation is reliable.

■■ ¶ 57. Because we have few cases in which a plaintiff appeals a remittitur order, we look to other jurisdictions for guidance regarding the appropriate standard for evaluating the size of a remittitur. By awarding the maximum amount the jury could have awarded, the trial court's order in this case is consistent with the preferred standard in the United States Court of Appeals for the Second Circuit because it is the least intrusive on the jury's verdict and thus most faithful to the jury's intent. *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328-30 (2d Cir. 1990). When the trial court is as deferential as possible to the jury verdict, appellate courts are "even less willing to find that [the

trial court] abused [its] discretion." *Id.* at 1330 n.8. We have recognized that Pennsylvania and Maine also favor this least intrusive standard, which sets the remittitur at the " 'highest amount any jury could properly award.' " *Haynes*, 166 Vt. at 240, 692 A.2d at 384 (quoting *Cashdollar v. Mercy Hosp.*, 595 A.2d 70, 76 (Pa. Super. Ct. 1991), and citing C. Harvey, et al., Maine Civil Practice § 59.2, at 368 (2d ed. Supp. 1981)); see also *Gillison v. Farrin*, 632 A.2d 143, 144 (Me. 1993). As the trial court's order here is supported, is reasonable, and is consistent with the accepted standards in these jurisdictions, and Vermont has no law to the contrary, there was no abuse of discretion either in the trial court's remittitur order or in the amount of the remittitur.

*Affirmed in part and reversed in part. Remanded for jury determination of punitive damages, if any, to be awarded.*