### Landmark Trust (USA), Inc. and Scott Farm, Inc. v. John Goodhue, Mary H. Panzera and First Vermont Bank & Trust Co.

[782 A.2d 1219]

No. 99-381

Present: **Dooley, Morse, Johnson and Skoglund, JJ., and Cheever, Supr. J., Specially Assigned**

Opinion Filed September 21, 2001

*Peter W. Hall* and *Mary E. Grady* of *Reiber, Kenlan, Schwiebert, Hall & Facey, P.C.*, Rutland, for Plaintiffs-Appellees.

*James B. Anderson* and *John A. Serafino* of *Ryan Smith & Carbine, Ltd.*, Rutland, for Defendant-Appellant Goodhue.

*Hanson S. Reynolds* of *Rackemann, Sawyer & Brewster*, Boston, Massachusetts, and *Timothy W. Caldwell*, Lyme, New Hampshire, for Defendant-Appellant Panzera.

**Johnson, J.** This dispute arose from the gift by Fred Holbrook, a noted Vermont apple orchardist, of his farm to plaintiffs Scott Farm, Inc., and Landmark Trust (USA), Inc., a land preservation organization. Defendants John Goodhue, a fourth cousin and guardian for Holbrook, and Mary Panzera, Holbrook's sister, sought to challenge the transfer of Scott Farm to plaintiffs on the ground that Holbrook was not competent at the time of the transfer in June 1995. Plaintiffs brought a declaratory judgment action to determine the validity of the transfer. After a bench trial, the Windham Superior Court ruled that the transfer was valid. We affirm.

Fred Holbrook is a life long bachelor who has lived most of his life on Scott Farm in Dummerston, Vermont. Holbrook had operated Scott Farm as an apple orchard since the early 1950s and continued to work on the farm until the fall of 1995. Holbrook was the sole shareholder in Scott Farm, Inc., and was keenly interested in preserving the farm as an apple orchard. The Landmark Trust (USA), Inc. is a nonprofit organization dedicated to land preservation. Its headquarters are also located in Dummerston, and the president of the organization is David Tansey. Landmark is a subsidiary of the Landmark Trust, an historical preservation society located in Great Britain.

Holbrook was the majority stockholder of the farm, but shared ownership with his mother Anna Holbrook, and sister, Mary Panzera. Anna Holbrook died in 1993 and left the family home to her two children, Fred and Mary. Fred exchanged his half interest in the house with his sister Mary for the remaining shares of stock. The

transaction made Holbrook the sole shareholder in August 1994. The monetary value of the half interest in the house was considerably greater than the value of the shares, but the consolidation of stock allowed Holbrook to carry out his intent to preserve the farm.

On June 23, 1995, Holbrook executed a deed of gift donating the stock of Scott Farm to Landmark. The value of the farm was approximately $1.4 million, and the gift to Landmark included $120,000 operating capital in addition to land, buildings and equipment comprising the farm. As part of the agreement, Holbrook retained the right to use his residence for his lifetime, rent free, and to claim any personal property within one year that was stored on the farm. At the closing, Holbrook received a $45,000 dividend from the farm's cash account.

In July 1995, Holbrook completed his estate plan by executing a will and inter vivos trust. Included in this instrument was a $10,000 bequest to his sister, Mary Panzera and a residuary clause that gave the trustees the right to decide which charities would receive the remainder of Holbrook's estate. Holbrook was unsatisfied with these aspects of his will and trust as he had repeatedly stated that he did not want his sister to inherit from him. In August 1995 Holbrook's will and trust were amended to omit any bequest to his sister and redirect the residuary of Holbrook's estate to Landmark.

In the fall of 1995, Fred Holbrook's mental acuity began to deteriorate. Although several of Holbrook's advisors and associates had previously noticed episodes of confusion, the fall of 1995 marked a substantial and rapid decline in Holbrook's condition. Holbrook began to have difficulty understanding financial matters and the arrangement with Landmark. He also experienced confusion in performing errands such as picking up a prescription at the pharmacy. Holbrook was unable to recognize his attorney, Ken Fisher, during a chance meeting on the streets of Brattleboro. Additionally, Holbrook began to lose interest in the day to day workings of Scott Farm, although in the middle of harvest season.

At the time that Holbrook began experiencing more difficulties with his cognitive functioning, John Goodhue, Holbrook's fourth cousin from Peducah, Kentucky arrived at the farm and began living in Holbrook's house. Goodhue, who did not yet know about the gift to Landmark, expressed an interest in acquiring Scott Farm. In December 1995, Goodhue and Panzera petitioned the probate court to have Holbrook placed under guardianship. Goodhue was appointed Holbrook's involuntary guardian in March 1996. Anticipating a

challenge to the validity of the transfers, Landmark filed a declaratory judgment action against Goodhue and Panzera, and defendants counterclaimed.

The trial court held a six day trial at which extensive evidence was heard on the issue of Holbrook's competence at the time he executed the deed, the trust and will, and the trust amendments. The court held that all transfers were valid. The court's findings of fact were extremely thorough, encompassing 240 separate findings over 75 pages of text. On balance, the court found Landmark's account of the events and of Holbrook's mental state credible. The court acknowledged that at the time of the gifts Holbrook was displaying some of the effects of Alzheimer's disease, which might call his competence into question, but that Holbrook was sufficiently cognizant to appreciate the nature and effect of his gifts. The court found that giving Scott Farm to Landmark was consistent with the preservation goals that Holbrook had clearly expressed for years. This appeal followed.

Defendants' principal claim on appeal is that the court erred in concluding that Fred Holbrook was competent at any time relevant to the transfer of his interest in Scott Farm. First, defendants argue that the court applied the wrong standard for competence by which it determined that the transfers were valid. Second, defendants raise numerous challenges to the court's findings of fact. Defendants allege that the court's findings are erroneous because of contrary or modifying evidence. They argue that the court should have weighed certain evidence about Holbrook's mental state and competence more heavily than other evidence on the same issue. According to defendants' view of the evidence, Holbrook was not competent to execute the disputed transfers. Additionally, defendants claim that the court erred in relying on medical conclusions about the stages of Alzheimer's disease detailed in *O'Brien v. Belsma*, 816 P.2d 665 (Or. Ct. App. 1991), that were not supported in this trial. Finally, defendants claim that the gifts were the result of undue influence by David Tansey on behalf of his employer, Landmark.

I.

■ Defendants first claim that the court erred in applying the standard for testamentary capacity to the inter vivos transfers. Defendants claim the tests are different and that competence to enter a highly complex inter vivos transaction should be different from the competence necessary to execute a will. In Vermont, the test for

testamentary capacity is "whether the testator had sufficient mind and memory at the time of making the will to remember who were the natural objects of his bounty, recall to mind his property, and dispose of it understandingly according to some plan formed in his mind." *In re Estate of Burt*, 122 Vt. 260, 263, 169 A.2d 32, 34 (1961). The trial court based its standard for donative capacity, however, on *Estate of Holton v. Ellis*, 114 Vt. 471, 49 A.2d 210 (1946), which defendants agree sets forth the standard for inter vivos gifts. In *Holton*, we held that a donor has sufficient mental capacity to make a gift when the donor understands and comprehends in a reasonable manner the nature and effect of the gift. *Id.* at 488, 49 A.2d at 222. We need not address the question of whether the standard set forth in *Holton* is indeed different from the standard for testamentary capacity because we agree with the trial court and defendants that *Holton* sets forth the proper inquiry for capacity to make an inter vivos gift.

Defendants argue, however, that the trial court should have reached a different result when it applied the *Holton* standard and that its reliance on the facts of that case is misplaced because the gift in *Holton* involved a very simple transaction. In *Holton*, a donor in her eighties was diagnosed with senile dementia some 21 months *after* creating a joint bank account with a plumber. The question for the court was whether the donor had sufficient mental capacity at the time she created the account. Although it is true that *Holton* involved a transaction that was less complex than the one entered by Holbrook, and therefore the *Holton* Court may have had no difficulty in finding the transaction was easily understood by the donor, the *Holton* case does not compel a different result here or the application of a different standard. The real dispute in this case is not over the standard, but how it was applied by the trial court. This is a mixed question of law and fact that is inextricably entwined with whether the trial court's findings of fact are sound on the evidence, and whether those facts support the trial court's conclusion. Where the trial court applied its factual findings to the correct legal standard, we will not disturb its conclusion if it is supported by the findings. See *City of Burlington v. Davis*, 160 Vt. 183, 184, 624 A.2d 872, 873 (1993) (court's conclusions which addressed mixed questions of law and fact will be upheld if supported by the findings); *Gallagher v. McCarthy*, 148 Vt. 258, 263, 532 A.2d 557, 559 (1987); *Lynch's Adm'r v. Murray*, 86 Vt. 1, 10, 83 A. 746, 750 (1912).

We turn, then, to whether the trial court's conclusion of law is supported by the evidence. Defendants' theory of the case was that

because Holbrook's mental condition had significantly deteriorated in the fall of 1995, he could not have been competent in the summer of 1995 when he gifted the farm and created the inter-vivos trust and amendment to the trust. Plaintiffs' theory was that, despite Holbrook's condition in the fall of 1995, contemporaneous evidence of his mental state at the time of the execution of the documents showed that Holbrook was competent.

We have repeatedly stated that where there is conflicting testimony on such a factual issue, " 'we will not set aside a judgment solely because we would reach a different conclusion on the facts.' " *Payrits v. Payrits*, 171 Vt. 50, 54, 757 A.2d 469, 472 (2000) (quoting *Price v. Price*, 149 Vt. 118, 120-21, 541 A.2d 79, 81 (1987)). Rather, when reviewing the factual findings of a trial court, we view them in the light most favorable to the prevailing party below, disregarding the effect of modifying evidence, and we will not set aside the findings unless they are clearly erroneous. *Brown v. Whitcomb*, 150 Vt. 106, 109, 550 A.2d 1, 3 (1988); V.R.C.P. 52(a). Findings of fact will not be disturbed merely because they are contradicted by substantial evidence; rather, an appellant must show there is no credible evidence to support them. *Community Feed Store, Inc. v. Northeastern Culvert Corp.*, 151 Vt. 152, 154-55, 559 A.2d 1068, 1069 (1989). Necessarily, the trial court had to make a choice about the persuasiveness of the evidence presented in support of each theory. That the court chose plaintiffs' evidence rather than defendants', and credited plaintiffs' theory of the case as more supportable is not grounds for error.

Nevertheless, we have reviewed each of defendants' numerous challenges to the findings against the record and have determined that the court's factual findings are supported by ample evidence despite the existence of contrary evidence in certain instances. The basis for each of the challenged factual findings rests solidly in the transcripts, with each finding typically grounded in the testimony of two or three separate witness. Defendants are unable to identify any finding that fails our deferential standard of review under V.R.C.P. 52.*

---

* Defendants make a brief argument that we should apply a nondeferential standard of review to the trial court's findings, citing *In re Nash*, 158 Vt. 458, 614 A.2d 367 (1991). The issue in *Nash* was whether the V.R.C.P. 52 clearly erroneous standard applied to testimony presented to the court solely through transcripts. We held, contrary to defendants' position, that the appellate standard of review was the same, regardless of whether the trial court made findings on the basis of live testimony or transcripts. *Id.* at 464, 614 A.2d at 369. Moreover, the instant case does not present the issue in *Nash* because here the trial court heard live testimony. Therefore, the clearly erroneous standard, which is highly deferential to the trial court, applies.

Not only are the court's findings not clearly erroneous, but they are based on a rational and sensible approach to digesting the evidence in this particular case, such that we cannot agree with defendants that the *Holton* standard was improperly applied. In sorting through the days of detailed testimony in which each side presented its view of events, the court credited evidence of Holbrook's competence that was based on contemporaneous recollections rather than retrospective opinions. That is, the court's findings are based on the testimony of those numerous advisers who were with Holbrook before, during and shortly after the time that he formulated the gift to Landmark, agreed to the estate plan, and executed the various documents, rather than the testimony of those who observed Holbrook well after the events in question and formed retrospective opinions as to Holbrook's likely condition on an earlier date.

For instance, defendants rely heavily on the testimony of Drs. Thomas Coffey and David Oxman to bolster the claim that Holbrook was incompetent. The two doctors are neurologists who first examined Holbrook after the challenged transactions, in late 1995 and 1996. They administered the MMSE as well as other tests of cognitive functioning. Dr. Oxman's initial assessment was that Holbrook was competent at the time of the transfers. That opinion, however, was subsequently revised when Dr. Oxman was presented with additional information from Dr. Coffey's later examination as well as information generated during the litigation that was presented by Goodhue's attorney. Similarly, Dr. Coffey's initial assessment was that he could not offer an opinion as to Holbrook's competency. After later examinations and further case history provided by Mary Panzera, Dr. Coffey revised that conclusion. At trial, both doctors concluded that Holbrook could not have been competent at the time of the relevant transactions. The court discounted Dr. Oxman and Dr. Coffey's assessments as "equivocal and speculative." The court found that even though Drs. Coffey and Oxman offered their opinions in good faith, "uncertainties . . . plague any retrospective conclusion about the extent of a progressive dementia."

More persuasive to the court was the testimony concerning Holbrook's functioning during 1995 when the transactions occurred. The court found there was considerable evidence attesting to Holbrook's ongoing capabilities in the summer and fall of 1995 of which the doctors were unaware. For example, Holbrook's long time physician, Dr. Tortolani, raised no alarms following an exam in June 1995 about Holbrook's ability "to drive himself home from the office, to

continue to operate a motor vehicle, or to continue to safely maintain himself alone in his home." Likewise, Tom Meyers, the trust officer at First Vermont Bank testified that Holbrook regularly stopped by the bank in the summer of 1995 to discuss his financial matters. Meyers indicated that Holbrook understood the nature of the transactions that occurred, and was able to pay his own bills on these visits to the bank. In particular, the court credited the testimony of Roy Mark, an orchardist who was hired to manage the Scott Farm in 1995. Mark had extensive interactions with Holbrook before and during the 1995 apple harvest. Mark specifically testified that Holbrook mentioned that he had given the farm to Landmark. Mark also testified that Holbrook was very comfortable operating a full size forklift, and was able to easily fix a controlled atmosphere machine that Mark himself was unable to fix. The court found that Mark's detailed testimony was "not easily reconciled with the suggestions by the physicians that cognitive deficiencies must have been pervasive and profound as early as May and June of [1995]."

Given the conflicting testimony between the physicians who examined Holbrook after the fall of 1995 and those persons who spent time with Holbrook during the summer and fall of 1995, it was well within the court's discretion to weigh certain testimony more heavily than other testimony or evidence. "As the trier of fact, it was the province of the trial court to determine the credibility of the witnesses and weigh the persuasiveness of the evidence." *Cabot v. Cabot*, 166 Vt. 485, 497, 697 A.2d 644, 652 (1997); see also *Kanaan v. Kanaan*, 163 Vt. 402, 405, 659 A.2d 128, 131 (1995) (trial court's findings accorded "wide deference on review" because court is "in a unique position to assess" credibility of witnesses and weight of evidence); *Mullin v. Phelps*, 162 Vt. 250, 261, 647 A.2d 714, 720 (1994) (role of Supreme Court in reviewing findings of fact is not to reweigh evidence or to make findings of credibility de novo).

Defendants also place great emphasis on the videotape of a Folstein Mini Mental State Exam (MMSE) administered to Holbrook in May 1996, almost a year after Holbrook executed the first document. The MMSE is a screening device to determine whether more comprehensive testing of cognitive function is necessary. The test does not permit conclusive assessment of cognitive capabilities. It requires the patient to perform simple tasks such as remembering three words in sequence, knowing the time and location, following instructions, repeating a few sentences, etc. In that video, Holbrook is significantly impaired in his efforts to communicate matters that he appears to com-

prehend. Holbrook's long time physician, Dr. Robert Tortolani, testified that the videotape accurately represents Holbrook's performance on another MMSE administered on June 9, 1995, before the deed of gift was executed. Defendants would have us conclude, based on this statement, that the video is enough evidence to prove that Holbrook was incompetent at the time of the transfers. At trial, however, there was undisputed testimony that the MMSE cannot provide a comprehensive assessment of cognitive functioning. Dr. Paul Newhouse is a geriatric psychiatrist who testified as to the reliability and limitations of the various assessment measures used on Holbrook. Dr. Newhouse discounted the value of an MMSE administered alone, as it was by Dr. Tortolani. Some of the factors that limit the test's usefulness are: the test is language based and thus penalizes patients who are language impaired but not otherwise as limited in their cognitive functioning, the test cannot identify areas of strength in cognitive capabilities, and the testing environment can be highly stressful, humiliating and embarrassing, which produces artificially low scores. In his testimony, Dr. Tortolani admitted that Holbrook did not like tests. Further, almost everyone who knew Holbrook mentioned that he usually spoke in short sentences or monosyllables, as demonstrated on the video. Based on the limited reliability of the MMSE, the court found the ten minute clinical procedure less indicative of Holbrook's mental state in 1995 than the testimony of numerous, contemporaneous observers of Holbrook's behaviors. Again, such a judgment is within the purview of the trier of fact. See *Bruntaeger v. Zeller*, 147 Vt. 247, 252, 515 A.2d 123, 126 (1986) ("[D]etermination by the trier of fact must stand if supported by credible evidence, even if inconsistencies or contrary evidence exists.").

Indeed, there is ample testimony that Holbrook was competent at the time he executed the various transfers, and that those transfers were in keeping with his long standing desire to preserve the farm from development, which was expressed many times before any question of his competency arose. Each of the attorneys and accountants who were with Holbrook at the time he executed the various transactions testified that they believed that Holbrook was competent and understood the transactions. For instance, Ken Fisher testified that Holbrook "exercised sound judgment and I felt that he was very competent in August of '95 to execute these 2 documents. If he wasn't I never would have let him sign them." Similarly, Tom Meyers testified that he "didn't have any doubts about his [Holbrook's] capacity to do the estate planning documents." As with Roy Mark's testimony, the

court found Meyers' testimony "strikingly inconsistent with the claimed level of incapacity." At trial, Charles Cummings admitted that he had concerns about Holbrook's competency because of his memory problems. Nevertheless, when asked whether Holbrook did "anything that raised concerns with you about whether he understood what he was doing in this process," Cummings answered no. Cummings further testified that Holbrook "was consistent in saying what he wanted to do as far as Scott Farm was concerned and that was that he didn't want it developed." It was not unreasonable for the court to conclude, on the basis of the testimony of Holbrook's attorneys and bank trust officer, all of whom have experience with the execution of legal documents, that they would not have executed the documents had they believed Holbrook was not competent. In view of the evidence credited by the trial court, we cannot say the trial court erred in concluding that Holbrook was competent to enter into the transactions because he reasonably understood the nature and effect of the transactions he was undertaking.

Additionally, defendants argue that the court erred in finding that Holbrook was suffering from early stage Alzheimer's as defined by *O'Brien v. Belsma*, 816 P.2d 665 (Or. Ct. App. 1991). *O'Brien* involved similar circumstances in which an inter vivos gift by a donor suffering from Alzheimer's was challenged. In that case, the court heard medical testimony that divided the progression of Alzheimer's into three stages. *Id.* at 667. There is no merit to defendants' claim because the court simply made no such finding. The court used *O'Brien* as an instructive example, not as controlling authority. The court's finding that in the summer and early fall of 1995 Holbrook was suffering from the early stages of Alzheimer's is a description of Holbrook's condition as presented by the testimony heard at trial, not a medical conclusion based on the *O'Brien* stages.

## II.

■ Finally, defendants contend that Holbrook's transactions are invalid because they were the result of undue influence exercised on him by those around him, particularly David Tansey, the president of Landmark Trust (USA), Inc. "Undue influence occurs when the [donor] no longer exercises free will," tainting resulting transactions. *In re Estate of Roche*, 169 Vt. 596, 597, 736 A.2d 777, 779 (1999) (mem.). "Any species of coercion, whether physical, mental, or moral, which subverts the sound judgment and genuine desire of the individual, is enough to constitute undue influence." *In re Everett's Will*, 105 Vt. 291,

315, 166 A. 827, 836 (1933). Undue influence vitiates a devise or gift because of the concern that the testator or donor has done "something contrary to his 'true' desires." *In re Estate of Rotax*, 139 Vt. 390, 392, 429 A.2d 1304, 1305 (1981); see *In re Estate of Bradshaw*, 24 P.3d 211, 214 (Mont. 2001) (applying undue influence standard for inter vivos gift very similar to Vermont standard for undue influence in a testamentary devise); see also *In re Zaborski*, No. 209055, 2000 WL 33418068, at *1 (Mich. Ct. App. June 30, 2000) (same); *Modie v. Andrews*, No. 19543, 2000 WL 1026682, at *3 (Ohio Ct. App. July 26, 2000) (same).

■ Ordinarily, the party claiming undue influence bears the burden of proof. *In re Estate of Raedel*, 152 Vt. 478, 481, 568 A.2d 331, 333 (1989). Vermont, however, recognizes an exception to this general rule that applies when there are suspicious circumstances surrounding the execution of the relevant documents. When there are suspicious circumstances, the burden shifts to the proponent of the document to show affirmatively that the will was not procured by undue influence. *Rotax*, 139 Vt. at 392, 429 A.2d at 1305. Suspicious circumstances typically arise when a testator's or donor's fiduciary benefits from the document at issue. We have stated that:

> [U]ndue influence may be presumed when relations between testator and beneficiary are suspect, such as those of guardian and ward, attorney and client, spiritual advisers and persons looking to them for advice — in fact, all relations of trust and confidence in which the temptation and opportunity for abuse would be . . . great . . . .

*Raedel*, 152 Vt. at 483, 568 A.2d at 334 (internal quotations omitted).

Defendants contend they produced sufficient evidence to prove suspicious circumstances, such that the burden of proof on undue influence shifted to the donees, as the proponents of the legal documents, to show that such documents were not procured improperly. They claim the trial court erred in not recognizing that the bar for proving undue influence is much lower when the donor is enfeebled, easily influenced or swayed.

■ Again, defendants predicate their argument for suspicious circumstances on their view of the evidence, which is that Holbrook was not competent, or if competent, was seriously compromised at the time he executed the documents effecting the transfer of the farm. Because the trial court rejected that view of the facts and defendants'

theory of the case, defendants' claim on this point must fail. Defendants retained the burden to prove undue influence by a preponderance of the evidence. There is little evidence to support the claim.

Nothing in the history of the relationship between Holbrook and Tansey indicates the transaction was not made at arm's length. Holbrook's relationship with Tansey began in 1992 when Scott Farm, Inc. sold a small property located on Scott Farm to Landmark, which was the former Rudyard Kipling house called "Naulakha." Naulakha was Landmark U.S.A.'s first historical renovation project, and Tansey moved to Scott Farm, renting space from Holbrook, to complete the project. In early 1994, Holbrook's accountant approached Tansey to inquire whether Landmark would be interested in Scott Farm because Holbrook was pleased with the work on Naulakha. Although other donees were approached, none would accept the property without an endowment to offset the cost of the farm's operation. Therefore, negotiations continued with Landmark through various attorneys and representatives who testified as to Holbrook's favorable view of Landmark as the donee. Under these circumstances, the fact that Tansey and Holbrook spent time together at the farm and discussed how the farm was to be transferred after Holbrook had chosen Landmark as the likely donee, does not, without more, compel a finding of undue influence.

In considering the claim below, the trial court found that none of the other hallmarks of undue influence was present. No evidence suggested that Landmark or Tansey will profit financially from the operation of Scott Farm. Nor was Tansey acting in a fiduciary capacity to Holbrook, since both Landmark and Holbrook were represented by independent financial and legal counsel before the transactions were consummated. Moreover, the gift is entirely consistent with Holbrook's wish that the farm be preserved from development. In other words, there is nothing on the face of the transaction to raise even the suspicion of undue influence. In fact, the conclusion to be drawn from these facts is rather that Landmark, Tansey and Holbrook shared a common interest in land preservation, and that Holbrook believed that Landmark was the only entity that could carry out his intent to preserve Scott Farm.

*Affirmed.*