2013 VT 118

**Joanne M. Curran, Michael G. Curran, M.D., and Cathleen A. Curran v. Building Fund of the United Church of Ludlow, VT, Black River Academy Museum, Ludlow Garden Club, et al.**

[88 A.3d 1204]

No. 12-346

Present: **Reiber, C.J., Dooley, Skoglund and Burgess, JJ., and Zimmerman, Supr. J. (Ret.), Specially Assigned**

Opinion Filed December 6, 2013

320

*John T. Sartore* and *Stephen J. Soule* of *Paul Frank + Collins P.C.*, Burlington, for Plaintiffs-Appellants.

*Peter F. Langrock, James W. Swift* and *Michele B. Patton* of *Langrock Sperry & Wool, LLP*, Middlebury, and *Andrew C. Boxer* and *Robert D. Mabey* of *Ellis, Boxer & Blake*, Springfield, for Defendants-Appellees/Cross-Appellants.

¶ 1. **Burgess, J.** Plaintiffs appeal from a judgment based on a jury verdict finding that the testator Phyllis Agan possessed the capacity and free will to execute a trust, leaving sizable bequests to defendants, various nonprofit organizations in the Town of Ludlow, Vermont. Defendants cross-appeal, claiming that the trial court erred in denying their requests for attorney's fees and prejudgment interest. We affirm.

¶ 2. The background to this dispute may be summarized as follows. Additional material facts will be set forth in the discussion section. For over sixty years, the testator lived with her husband William ("Bill") Agan in the Town of Ludlow, where both were active in a variety of community organizations and activities. After Bill died, the testator placed her assets into the Phyllis G. Agan Trust in 1993. The original trust beneficiaries were the testator's brother Michael, sisters Joanne and Patricia, and Joanne's children (the testator's niece and nephew) Michael and Cathleen Curran. In 1996, the testator amended the trust to reduce the bequest to Michael Curran, with whom she had a falling out, and to add bequests to three local community organizations: the Building Fund of the United Church of Ludlow, the Black River Academy Museum of Ludlow, and the Black River Valley Senior Center of Ludlow. A third trust amendment in May 2004 deleted Michael Curran as a beneficiary. Additional trust amendments in December 2004, February 2005, and May 2005 variously altered the trustee, successor trustee, and trust account.

¶ 3. Relatives and others who dealt with the testator during the period from 2004 to 2005 observed personality changes and signs of confusion. Her primary care physician diagnosed dementia or organic brain syndrome in June 2004, observed evidence of "sundowning" or nighttime confusion in November 2004, and pre-

scribed several medications in 2005 to help arrest the effects of dementia. In December 2004, the testator turned to her longtime friend and neighbor Bob Kirkbride for assistance in helping her pay her bills. In May 2005, the testator contacted an attorney whom she had known for many years, Martin Nitka, to draft a number of additional changes to her trust.

¶ 4. Less than a week after the testator contacted attorney Nitka, the testator's sister Patricia filed an involuntary guardianship petition supported in part by a letter from her physician, drafted in December 2004, stating that the testator had "some dementia" which could affect her decisionmaking and recommending the appointment of a guardian. The testator, in response, filed a petition to appoint Kirkbride as a voluntary guardian. An evaluation by a court-appointed psychiatrist found that the testator had mild senile dementia but that "overall she show[ed] no sign of inability to assist in making decisions about her life," had a "fair knowledge of her current business dealings and her financial value," and readily agreed on the need for a guardian to provide some help but wished to have a say in who was chosen. Following a hearing in August 2005, Patricia withdrew her petition and the probate court granted the testator's petition, finding that she understood the nature and consequences of the requested voluntary guardianship.

¶ 5. The testator's interest in amending the trust remained, and to that end she met with Kirkbride each morning for a period of about a week in August 2005 to discuss proposed changes. Kirkbride recalled that the testator asked him for suggestions for charities to include in the trust as beneficiaries, which he provided; that she included most but not all of the suggestions in a list later provided to attorney Nitka; that she initially planned to exclude her sister Patricia and nephew Michael from the trust but that he tried to persuade her not to do so because they were "family"; and that it was the testator who made the final decisions as to the beneficiaries to include in the amended trust and the amounts they were to receive.

¶ 6. Attorney Nitka recalled that he met with the testator several times to discuss the proposed changes to the trust. It appeared to him that the testator understood who her relatives were, what her assets were, and the choices she was making in amending the trust. He saw nothing to indicate that anyone was influencing the testator's decisions.

¶ 7. The testator signed the resulting seventh trust amendment in November 2005. Aside from the three local organizations named earlier, the beneficiaries included a number of additional nonprofit organizations in the Town of Ludlow, including the Ludlow Garden Club, the Ludlow Rotary, the Ludlow American Legion Auxiliary, and Black River Good Neighbor Services. The charitable bequests ranged from $100,000 to $150,000. The testator's sister Joanne received fifteen percent of the estate, her nephew Michael received a bequest of $50,000, and her niece Cathleen received the testator's home, furnishings, jewelry and other personal property, and was named as the residuary beneficiary.

¶ 8. The testator died in May 2008. The estate at the time was worth in excess of eight million dollars. In April 2009, three members of the testator's family named as beneficiaries under the seventh amended trust, the testator's sister Joanne Curran, nephew Michael Curran, and niece Cathleen Curran (plaintiffs), filed a complaint for declaratory relief in superior court naming as defendants the nonprofit organizations receiving bequests under the trust. Plaintiffs sought a declaration that the testator lacked the capacity to execute the seventh trust amendment, and that the amendment was the product of undue influence and was invalid as a result.

¶ 9. ■ An eight-day jury trial was held in February 2012. In addition to the evidence summarized above, plaintiffs called two mental health experts who offered a "retrospective" diagnosis of the testator as suffering from moderate Alzheimer's disease, a cognitive disability which, in their view, would have undermined her testamentary capacity and rendered her susceptible to undue influence. At the close of plaintiffs' case, the court found sufficient evidence of "suspicious circumstances" to shift the burden of proof to defendants to show by a preponderance of the evidence that the seventh trust amendment was not the product of undue influence. See *Landmark Trust (USA), Inc. v. Goodhue*, 172 Vt. 515, 524, 782 A.2d 1219, 1228 (2001) ("Undue influence occurs when the [donor] no longer exercises free will, tainting the resulting transactions." (quotation omitted)); *In re Estate of Raedel*, 152 Vt. 478, 481, 568 A.2d 331, 333 (1989) (holding that burden of proof "shifts to the proponent of the will" when court finds that the "circumstances connected with the execution of the will are such as the law regards with suspicion" (quotation omitted)). The court relied on the evidence, summarized above, of

the testator's "mental deterioration [during the] period preceding the amendment and thus her susceptibility to undue influence," her inability to manage her daily life and finances without the assistance of her guardian and caregivers, the "flurry" of trust amendments within a period of eighteen months, the substantial increase in the number of beneficiary organizations and size of the bequests, and her guardian's efforts to persuade her to amend the trust to include family members.

¶ 10. Defendants thereafter presented the testimony of a mental health expert, Dr. Paul Solomon, a neuropsychologist, professor, and director of memory clinics in Boston and Vermont, whose retrospective diagnosis of the testator differed markedly from plaintiffs' experts. Dr. Solomon testified that the testator's cognitive deficiencies were "relatively mild" and highly situational; they appeared to be worse when she was on her own, and improved after she acquired additional caregivers in the months before she executed the seventh trust amendment. Summarizing his conclusions, Dr. Solomon opined that the testator "knew who she would like to give [her] money to and she knew the amounts and she understood how it happens." The bequests to defendants represented "places that . . . make sense for her, places that she had ties to."[1] Defendants also introduced the testimony of several persons who interacted with the testator on a regular basis during the period in question, who recalled that she appeared to be mentally aware and competent.

¶ 11. The jury returned a special verdict, finding that the testator had the capacity to execute the seventh trust amendment, and that it was not the product of undue influence. The court denied plaintiffs' subsequent motion for judgment as a matter of law or, in the alternative, for a new trial. This appeal followed.

¶ 12. Plaintiffs contend the trial court erred in refusing to enter judgment as a matter of law or, in the alternative, to order a new

---

[1] Dr. Solomon's testimony in this regard was corroborated by a number of witnesses who testified to the testator's longstanding and active involvement in several of the community organizations which received bequests under the seventh amended trust, including the local chapter of the American Legion Auxiliary, the Ludlow Garden Club, and the United Church of Ludlow. There was also evidence of the testator's ties to two other organizations which received bequests: the local organization of Masons, of which her husband was a longstanding member, and the Black River Senior Center of Ludlow, which operated the Meals-on-Wheels program that made weekly deliveries to the testator for a number of years.

trial on the issue of undue influence. They claim, in particular, that defendants adduced "[n]o countervailing evidence" to rebut the presumption of undue influence found by the trial court at the close of plaintiffs' case, thus entitling them to a directed verdict and a judgment voiding the seventh trust amendment. We review a motion for judgment as a matter of law under the same standard as the trial court, and will not disturb a jury verdict if it "is justified by any reasonable view of the evidence" considered in the light most favorable to the nonmoving party and excluding the effect of any modifying evidence. *Follo v. Florindo*, 2009 VT 11, ¶¶ 26-27, 185 Vt. 390, 970 A.2d 1230 (quotation omitted). Similarly, when considering a motion for new trial, we view the evidence "in the light most favorable to the jury verdict," and only where the verdict is "shown to be clearly wrong and unjust because the jury disregarded the reasonable and substantial evidence, or found against it, because of passion, prejudice, or some misconception of the matter, can the court exercise its discretion to set aside the verdict." *Pirdair v. Med. Ctr. Hosp. of Vt.*, 173 Vt. 411, 416, 800 A.2d 438, 443 (2002) (quotation omitted). We review the trial court's decision on a motion for new trial solely for abuse of discretion. *Id.* at 416, 800 A.2d at 442.

¶ 13. ▮ Assessed by these standards, we find the record evidence here more than sufficient to support the jury verdict on undue influence. Plaintiffs' assertion that the guardian's testimony permitted "no other conclusion . . . than undue influence" regardless of defendants' rebuttal evidence significantly overstates the testimony in question. Although Kirkbride, the testator's guardian, acknowledged that he pushed or "drove" the testator to include bequests for family members, he also testified that regardless of his efforts the testator "wanted to do it, that's the only thing I would say about 'driving' it." He also testified that it was the testator who "asked [him] for suggestions" for bequests to the community, and it was the testator who decided the specific amount for each bequest.

¶ 14. Defendants also adduced substantial evidence rebutting plaintiffs' portrayal of the testator as highly susceptible to manipulation by her guardian due to midstage or moderate Alzheimer's disease. As noted, defendants' expert neuropsychologist, Dr. Solomon, testified that the testator's cognitive deficiencies were "relatively mild" and that she possessed the capacity to understand the natural objects of her bounty, her property, and the

plan for its disposition. Although plaintiffs attempt to draw a sharp line between evidence relating to testamentary capacity and undue influence — suggesting that Dr. Solomon's testimony related solely to the former — their own expert neuropsychologist, Dr. Daniel Marson, acknowledged that "in these kinds of cases, the capacity issue and the undue-influence issue are often very closely intertwined."

¶ 15. Furthermore, Dr. Solomon did address the coercion issue more directly, observing that the frequent meetings and discussions between Kirkbride and the testator prior to the seventh trust amendment did not necessarily suggest anything improper, as persons with mild cognitive impairments often require multiple meetings and conversations to understand an issue and make their views clear. Thus, the expert concluded: "I think [Kirkbride] tried to provide [the testator] with an environment in which *she* could make decisions that she felt were the best decisions to make. And I think he revisited it on many occasions not to try to persuade her but to make sure that she understood." (Emphasis added.)

¶ 16. In addition to defendants' mental health expert, the testator's attorney, Martin Nitka, testified that he had known the testator for forty years, that she had contacted him about revising the trust instrument,[2] and that he "had no question that she understood what was going on." As for the specific bequests to defendants, he recalled that the testator had indicated that "she was proud to be a resident of Ludlow" and "wanted to . . . do something for the Town."[3]

¶ 17. Viewed as a whole, therefore, we find that defendants' evidence was sufficient to rebut the presumption and to support the jury's finding that the seventh trust amendment was not the product of undue influence.

¶ 18. ■ Plaintiffs also contend that the trial court erred in denying their motion for a new trial on the issue of testamentary capacity. See *Landmark Trust,* 172 Vt. at 518-19, 782 A.2d at 1224

---

[2] Attorney Nitka testified that the testator "came to visit me and she said she wanted to make some changes to her estate plan, her will, her trust."

[3] To accommodate plaintiffs' witness schedule the trial court allowed attorney Nitka to testify for defendants out of order, prior to the close of plaintiffs' case-in-chief. The court did not, however, cite or rely on attorney Nitka's evidence in finding that the circumstances were sufficiently suspicious to shift the burden of proof, and, in fact, later cited his testimony in ruling that defendants had effectively rebutted the presumption of undue influence.

(observing that "the test for testamentary capacity is whether the testator had sufficient mind and memory at the time of making the will to remember who were the natural objects of his bounty, recall to mind his property, and dispose of it understandingly according to some plan formed in his mind" (quotation omitted)). Plaintiffs recite in this regard much of the evidence summarized earlier, including their experts' retrospective diagnosis that the testator was suffering from moderate Alzheimer's disease which disabled her from understanding the extent of her property and forming a plan for its disposal; the testimony of the testator's primary care doctor who noted signs of dementia as early as June 2004, prescribed a number of medications, and had reservations about her capacity to execute the trust amendment; the testimony of the testator's former attorney who thought that she had lost her testamentary capacity by June of 2005, several months before executing the seventh trust amendment; and the testimony of family members and others who recounted instances of the testator's confusion during the period preceding the trust amendment.

¶ 19. ■ As the trial court here observed, however, the record also contained substantial countervailing evidence — including the testimony of Dr. Solomon, who was of the opinion that the testator had the mental capacity to understand the natural objects of her bounty and the extent of her property, and to form a·plan for its disposition; the testimony of attorney Nitka whose observation of the testator led him to conclude that she understood the terms of the seventh trust amendment; the testimony of the testator's guardian, Robert Kirkbride, who interacted closely with the testator and firmly believed that she understood and made all of the final decisions incorporated into the final trust amendment; and the testimony of others from the community who interacted with the testator during this period and saw no evidence of mental incapacity. These witnesses included a volunteer with the local Meals-on-Wheels program who testified that he visited with the testator weekly during this period, that they often spoke for fifteen to twenty minutes at a time, that she was "always interested in what was going on in Ludlow," and that she was always "very lucid" and never confused. A neighbor of many years also testified that he frequently saw the testator during the summer and fall of 2005, that she never failed to recognize him, was mentally "sharp," and never appeared to be confused.

¶ 20. Viewed as a whole and in the light most favorable to the jury's verdict, the record evidence thus does not support plaintiffs' claim that the verdict on testamentary capacity was "clearly wrong and unjust" or the product of passion or prejudice. *Pirdair*, 173 Vt. at 416, 800 A.2d at 443 (quotation omitted). Accordingly, we find no basis to conclude that the court abused its discretion in denying the motion for a new trial.

¶ 21. ■ Turning to the cross-appeal, defendants contend the trial court erred in denying their requests for attorney's fees and prejudgment interest. The claims are unpersuasive, and require no extensive discussion. The motion for attorney's fees had two bases. First, defendants relied on 14A V.S.A. § 1004, which provides: "In a judicial proceeding involving the administration of a trust, the probate division of the superior court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy." Second, defendants argued that the court should invoke its inherent equitable power to award attorney's fees in the interests of justice. See *In re Gadhue*, 149 Vt. 322, 327, 544 A.2d 1151, 1154 (1987) (noting the "historic powers of equity courts to award attorney's fees as the needs of justice dictate").

¶ 22. The trial court found no basis for an award of attorney's fees on either of the grounds advanced by defendants. It ruled that the statute was inapplicable because this was not a judicial proceeding involving "the administration" of a trust but rather a dispute between beneficiaries to determine its validity. It also concluded that this was not a case in which "reasons of justice require[d] an award of attorney's fees." Although defendants maintained that they had incurred attorney's fees "defending the trust" and that it would be inequitable to dilute their bequests as a consequence, the trial court observed that this was a contest between beneficiaries and that defendants were " 'defending' their interests in receiving the gifts set out in the seventh amendment and for no other purpose related to the trust itself."

¶ 23. ■ ■ Although defendants contend that the court misinterpreted § 1004 in concluding that the lawsuit did not involve "the administration of a trust," we need not specifically address or resolve the claim. For even assuming that "administration" of the estate could be construed to include a contest between beneficia-

ries over the testator's capacity or free will in establishing the trust, the issue would remain whether "justice and equity" require an award of attorney's fees under the statute — a question which in this case is largely indistinguishable from whether the court abused its discretion under its common-law authority in ruling that attorney's fees were not required for "reasons of justice." On this issue, we discern no basis to conclude that the court abused its discretion in determining that this dispute between beneficiaries under the trust implicated no considerations of justice or equity that warranted an award of attorney's fees. See *Knappmiller v. Bove*, 2012 VT 38, ¶ 4, 191 Vt. 629, 48 A.3d 607 (mem.) (observing that awards for attorney's fees are generally reviewed for abuse of discretion).[4] A similar conclusion follows with respect to defendants' claim that they were "equitably" entitled to an award of prejudgment interest on their bequests under the trust. See *Estate of Fleming v. Nicholson*, 168 Vt. 495, 502, 724 A.2d 1026, 1031 (1998) (recognizing that prejudgment interest may be awarded in court's discretion "where required to avoid an injustice"). The record discloses no basis to conclude that the court abused its discretion in rejecting the claim that prejudgment interest was required in this case to avoid injustice. Accordingly, we discern no basis to disturb the judgment.

*Affirmed.*

---

[4] Although defendants raise a corollary claim that the probate court had the authority to determine the attorney's fee issue in the first instance under § 1004, they do not specifically challenge the probate court's ruling in this matter that, where the civil division already had jurisdiction, "both the law and common sense dictate the consideration of the award of . . . fees by that court."