2013 VT 118



Curran v.
Building Fund of the United Church of Christ of Ludlow, VT. 
(2012-346)

 

2013 VT 118

 

[Filed 6-Dec.-2013]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.

 

 


 2013 VT 118
 
  


 No. 2012-346
 
  


 Joanne M. Curran, Michael G.
 Curran, M.D., and
 
 
 Supreme Court
 
 
 Cathleen A. Curran
 
 
  
 
 
  
 
 
 On Appeal from
 
 
      v.
 
 
 Superior Court, Windsor Unit,
 
 
  
 
 
 Civil Division
 
 
 Building Fund of the United Church of Ludlow, VT,
 
 
  
 
 
 Black River Academy Museum,
 Ludlow Garden Club,
 et al.
 
 
 May Term, 2013
 
 
  
 
 
  
 
 
 Theresa
 S. DiMauro, J.
 
 
  
 
 John T. Sartore and Stephen J.
Soule of Paul Frank + Collins P.C., Burlington, for 

  Plaintiffs-Appellants.

 

Peter F. Langrock, James W. Swift
and Michele B. Patton of Langrock Sperry & Wool,
LLP,

  Middlebury, and Andrew C. Boxer and Robert D. Mabey of Ellis Boxer & Blake, Springfield,

  for Defendants-Appellees/Cross-Appellants.

 

 

PRESENT:   Reiber, C.J., Dooley, Skoglund and Burgess, JJ., and
Zimmerman, Supr. J. (Ret.),

                    
Specially Assigned

 

 

¶ 1.            
BURGESS, J.   Plaintiffs appeal from a judgment based on
a jury verdict finding that the testator Phyllis Agan
possessed the capacity and free will to execute a trust, leaving sizable
bequests to defendants, various nonprofit organizations in the Town of Ludlow,
Vermont.  Defendants cross-appeal, claiming that
the trial court erred in denying their requests for attorney’s fees and
prejudgment interest.  We affirm. 

¶ 2.            
The background to this dispute may be summarized as follows. 
Additional material facts will be set forth in the discussion section. 
For over sixty years, the testator lived with her husband William (“Bill”) Agan in the Town of Ludlow, where both were active in a
variety of community organizations and activities.  After Bill died, the
testator placed her assets into the Phyllis G. Agan
Trust in 1993.  The original trust beneficiaries were the testator’s
brother Michael, sisters Joanne and Patricia, and Joanne’s children (the
testator’s niece and nephew) Michael and Cathleen Curran.  In 1996, the
testator amended the trust to reduce the bequest to Michael Curran, with whom
she had a falling out, and to add bequests to three local community
organizations: the Building Fund of the United Church of Ludlow, the Black
River Academy Museum of Ludlow, and the Black River Valley Senior Center of
Ludlow.  A third trust amendment in May 2004 deleted Michael Curran as a
beneficiary.  Additional trust amendments in December 2004, February 2005,
and May 2005 variously altered the trustee, successor trustee, and trust
account.  

¶ 3.            
Relatives and others who dealt with the testator
during the period from 2004 to 2005 observed personality changes and signs of
confusion.  Her primary care physician diagnosed dementia or
organic brain syndrome in June 2004, observed evidence of “sundowning”
or nighttime confusion in November 2004, and prescribed several medications in
2005 to help arrest the effects of dementia.  In December 2004, the
testator turned to her longtime friend and neighbor Bob Kirkbride
for assistance in helping her pay her bills.  In May 2005, the testator
contacted an attorney whom she had known for many years, Martin Nitka, to draft a number of additional changes to her
trust.   

¶ 4.            
Less than a week after the testator contacted attorney Nitka, the testator’s sister Patricia filed an involuntary
guardianship petition supported in part by a letter from her physician, drafted
in December 2004, stating that the testator had “some dementia” which could
affect her decisionmaking and recommending the
appointment of a guardian.  The testator, in response, filed a petition to
appoint Kirkbride as a voluntary guardian.  An
evaluation by a court- appointed psychiatrist found that the testator had mild
senile dementia but that “overall she show[ed] no
sign of inability to assist in making decisions about her life,” had a “fair
knowledge of her current business dealings and her financial value,” and
readily agreed on the need for a guardian to provide some help but wished to
have a say in who was chosen.  Following a hearing in August 2005,
Patricia withdrew her petition and the probate court granted the testator’s
petition, finding that she understood the nature and consequences of the
requested voluntary guardianship. 

¶ 5.            
The testator’s interest in amending the trust remained, and to that end
she met with Kirkbride each morning for a period of
about a week in August 2005 to discuss proposed changes.  Kirkbride recalled that the testator asked him for
suggestions for charities to include in the trust as beneficiaries, which he
provided; that she included most but not all of the suggestions in a list later
provided to attorney Nitka; that she initially
planned to exclude her sister Patricia and nephew Michael from the trust but
that he tried to persuade her not to do so because they were “family;” and that
it was the testator who made the final decisions as to the beneficiaries to
include in the amended trust and the amounts they were to receive. 

¶ 6.            
 Attorney Nitka recalled that he met with
the testator several times to discuss the proposed changes to the trust. 
It appeared to him that the testator understood who her relatives were, what
her assets were, and the choices she was making in amending the trust.  He
saw nothing to indicate that anyone was influencing the testator’s
decisions.    

¶ 7.            
The testator signed the resulting seventh trust amendment in November
2005.  Aside from the three local organizations named earlier, the
beneficiaries included a number of additional nonprofit organizations in the
Town of Ludlow, including the Ludlow Garden Club, the Ludlow Rotary, the Ludlow
American Legion Auxiliary, and Black River Good Neighbor Services.  The
charitable bequests ranged from $100,000 to $150,000.  The testator’s
sister Joanne received fifteen percent of the estate, her nephew Michael
received a bequest of $50,000, and her niece Cathleen received the testator’s
home, furnishings, jewelry and other personal property, and was named as the
residuary beneficiary. 

¶ 8.            
The testator died in May 2008.  The estate at the time was worth in
excess of eight million dollars.  In April 2009, three members of the
testator’s family named as beneficiaries under the seventh amended trust, the
testator’s sister Joanne Curran, nephew Michael Curran, and niece Cathleen
Curran (plaintiffs), filed a complaint for declaratory relief in superior court
naming as defendants the nonprofit organizations receiving bequests under the
trust.  Plaintiffs sought a declaration that the testator lacked the capacity
to execute the seventh trust amendment, and that the amendment was the product
of undue influence and was invalid as a result.

¶ 9.            
An eight-day jury trial was held in February 2012.  In addition to
the evidence summarized above, plaintiffs called two mental health experts who
offered a “retrospective” diagnosis of the testator as suffering from moderate
Alzheimer’s disease, a cognitive disability which, in their view, would have
undermined her testamentary capacity and rendered her susceptible to undue
influence.  At the close of plaintiffs’ case, the court found sufficient
evidence of “suspicious circumstances” to shift the burden of proof to
defendants to show by a preponderance of the evidence that the seventh trust
amendment was not the product of undue influence.  See Landmark Trust
(USA), Inc. v. Goodhue, 172 Vt. 515, 524, 782 A.2d 1219, 1228 (2001)
(“Undue influence occurs when the [donor] no longer exercises free will,
tainting the resulting transactions.” (quotation
omitted)); In re Raedel, 152 Vt. 478, 481, 568
A.2d 331, 333 (1989) (holding that burden of proof “shifts to the proponent of
the will” when court finds that the “circumstances connected with the execution
of the will are such as the law regards with
suspicion” (quotation omitted)).  The court relied on the evidence,
summarized above, of the testator’s “mental deterioration [during the] period
preceding the amendment and thus her susceptibility to undue influence,” her
inability to manage her daily life and finances without the assistance of her
guardian and caregivers, the “flurry” of trust amendments within a period of
eighteen months, the substantial increase in the number of beneficiary
organizations and size of the bequests, and her guardian’s efforts to persuade
her to amend the trust to include family members.  

¶ 10.         Defendants
thereafter presented the testimony of a mental health expert, Dr. Paul Solomon,
a neuropsychologist, professor, and director of memory clinics in Boston and
Vermont, whose retrospective diagnosis of the testator differed markedly from
plaintiffs’ experts.  Dr. Solomon testified that the testator’s cognitive
deficiencies were “relatively mild” and highly situational; they appeared to be
worse when she was on her own, and improved after she acquired additional
caregivers in the months before she executed the seventh trust amendment. 
Summarizing his conclusions, Dr. Solomon opined that the testator “knew who she
would like to give [her] money to and she knew the amounts and she understood
how it happens.”  The bequests to defendants represented “places that . .
. make sense for her, places that she had ties to.”[1]  Defendants also introduced the
testimony of several of persons who interacted with the testator on a regular
basis during the period in question, who recalled that she appeared to be
mentally aware and competent.   

¶ 11.          The
jury returned a special verdict, finding that the testator had the capacity to
execute the seventh trust amendment, and that it was not the product of undue
influence.  The court denied plaintiffs’ subsequent motion for judgment as
a matter of law or, in the alternative, for a new trial.  This appeal
followed.  

¶ 12.         Plaintiffs
contend the trial court erred in refusing to enter judgment as a matter of law
or, in the alternative, to order a new trial on the issue of undue
influence.  They claim, in particular, that defendants adduced “[n]o
countervailing evidence” to rebut the presumption of undue influence found by
the trial court at the close of plaintiffs’ case, thus entitling them to a
directed verdict and a judgment voiding the seventh trust amendment.  We
review a motion for judgment as a matter of law under the same standard as the
trial court, and will not disturb a jury verdict if it “is justified by any
reasonable view of the evidence” considered in the light most favorable to the
nonmoving party and excluding the effect of any modifying evidence.  Follo
v. Florindo, 2009 VT 11, ¶¶ 26-27, 185 Vt. 390,
970 A.2d 1230 (quotation omitted).  Similarly, when considering a
motion for new trial, we view the evidence “in the light most favorable to the
jury verdict,” and only where the verdict is “shown to be clearly wrong and
unjust because the jury disregarded the reasonable and substantial evidence, or
found against it, because of passion, prejudice, or some misconception of the
matter, can the court exercise its discretion to set aside the verdict.”  Pirdair
v. Med. Ctr. Hosp. of Vt., 173 Vt. 411, 416, 800 A.2d 438, 443 (2002)
(quotation omitted).  We review the trial court’s decision on a
motion for new trial solely for abuse of discretion.  Id., 173 Vt.
at 416, 800 A.2d at 442.     

¶ 13.         Assessed
by these standards, we find the record evidence here more than sufficient to
support the jury verdict on undue influence.  Plaintiffs’ assertion that
the guardian’s testimony permitted “no other conclusion . . . than undue
influence” regardless of defendants’ rebuttal evidence significantly overstates
the testimony in question.  Although Kirkbride,
the testator’s guardian, acknowledged that he pushed or “drove” the testator to
include bequests for family members, he also testified that regardless of his
efforts the testator “wanted to do it, that’s the only thing I would say about
‘driving’ it.”  He also testified that it was the testator who “asked
[him] for suggestions” for bequests to the community, and it was the testator
who decided the specific amount for each bequest.      

¶ 14.         Defendants
also adduced substantial evidence rebutting plaintiffs’ portrayal of the
testator as highly susceptible to manipulation by her guardian due to mid-stage
or moderate Alzheimer’s disease.  As noted, defendants’ expert
neuropsychologist, Dr. Solomon, testified that the testator’s cognitive
deficiencies were “relatively mild” and that she possessed the capacity to
understand the natural objects of her bounty, her property, and the plan for
its disposition.  Although plaintiffs attempt to draw a sharp line between
evidence relating to testamentary capacity and undue influence—suggesting that
Dr. Solomon’s testimony related solely to the former—their own expert
neuropsychologist, Dr. Daniel Marson, acknowledged
that “in these kinds of cases, the capacity issue and the undue-influence issue
are often very closely intertwined.” 

¶ 15.         Furthermore,
Dr. Solomon did address the coercion issue more directly, observing that the
frequent meetings and discussions between Kirkbride
and the testator prior to the seventh trust amendment did not necessarily
suggest anything improper, as persons with mild cognitive impairments often
require multiple meetings and conversations to understand an issue and make
their views clear.  Thus, the expert concluded: “I think [Kirkbride] tried to provide [the testator] with an
environment in which she could make decisions that she felt were the
best decisions to make.  And I think he revisited it on many occasions not
to try to persuade her but to make sure that she understood.”  (Emphasis
added.)  

¶ 16.         In
addition to defendants’ mental health expert, the testator’s attorney, Martin Nitka, testified that he had known the testator for forty years, that she had contacted him about revising the trust
instrument,[2]
and that he “had no question that she understood what was going on.”  As
for the specific bequests to defendants, he recalled that the testator had
indicated that “she was proud to be a resident of Ludlow” and “wanted to . . .
do something for the Town.”[3] 


¶ 17.         Viewed
as a whole, therefore, we find that defendants’ evidence was sufficient to
rebut the presumption and to support the jury’s finding that the seventh trust
amendment was not the product of undue influence.

¶ 18.         Plaintiffs
also contend that the trial court erred in denying their motion for a new trial
on the issue of testamentary capacity.  See Landmark Trust, 172 Vt.
at 518-19, 782 A.2d at 1224 (observing that “the test for testamentary capacity
is whether the testator had sufficient mind and memory at the time of making
the will to remember who were the natural objects of his bounty, recall to mind
his property, and dispose of it understandingly according to some plan formed
in his mind” (quotation omitted)).  Plaintiffs recite in this regard much
of the evidence summarized earlier, including their experts’ retrospective
diagnosis that the testator was suffering from moderate Alzheimer’s disease
which disabled her from understanding the extent of her property and forming a
plan for its disposal; the testimony of the testator’s primary care doctor who
noted signs of dementia as early as June 2004, prescribed a number medications,
and had reservations about her capacity to execute the trust amendment; the
testimony of the testator’s former attorney who thought that she had lost her
testamentary capacity by June of 2005, several months before executing the
seventh trust amendment; and the testimony of family members and others who
recounted instances of the testator’s confusion during the period preceding the
trust amendment. 

¶ 19.         As
the trial court here observed, however, the record also contained substantial
countervailing evidence—including the testimony of Dr. Solomon, who was of the
opinion that the testator had the mental capacity to understand the natural
objects of her bounty and the extent of her property, and to form a plan for
its disposition; the testimony of attorney Nitka
whose observation of the testator led him to conclude that she understood the
terms of seventh trust amendment; the testimony of the testator’s guardian,
Robert Kirkbride, who interacted closely with the
testator and firmly believed that she understood and made all of the final decisions
incorporated into the final trust amendment; and the testimony of others from
the community who interacted with the testator during this period and saw no
evidence of mental incapacity.  These witnesses included a volunteer with
the local Meals-on-Wheels program who testified that he visited with the
testator weekly during this period, that they often spoke for fifteen to twenty
minutes at a time, that she was “always interested in what was going on in
Ludlow,” and that she was always “very lucid” and never confused.  A
neighbor of many years also testified that he frequently saw the testator
during the summer and fall of 2005, that she never failed to recognize him, was
mentally “sharp,” and never appeared to be
confused.     

¶ 20.         Viewed
as a whole and in the light most favorable to the jury’s verdict, the record
evidence thus does not support plaintiffs’ claim that the verdict on
testamentary capacity was “clearly wrong and unjust” or the product of passion
or prejudice.  Pirdair, 173 Vt. at 416, 800 A.2d at 443 (quotation omitted). 
Accordingly, we find no basis to conclude that the court abused its discretion
in denying the motion for a new trial.

¶ 21.         Turning
to the cross-appeal, defendants contend the trial court erred in denying their
requests for attorney’s fees and prejudgment interest.  The claims are
unpersuasive, and require no extensive discussion.  The motion for
attorney’s fees had two bases.  First, defendants relied on 14A V.S.A. §
1004, which provides: “In a judicial proceeding involving the administration of
a trust, the probate division of the superior court, as justice and equity may
require, may award costs and expenses, including reasonable attorney’s fees, to
any party, to be paid by another party or from the trust that is the subject of
the controversy.”  Second, defendants argued that the court should invoke
its inherent equitable power to award attorney’s fees in the interests of
justice.  See In re Gadhue, 149 Vt. 322,
327, 544 A.2d 1151, 1154 (1987) (noting the “historic powers of equity courts
to award attorney’s fees as the needs of justice dictate”). 

¶ 22.         The
trial court found no basis for an award of attorney’s fees on either of the  grounds advanced by defendants.  It ruled that
the statute was inapplicable because this was not a judicial proceeding
involving “the administration” of a trust but rather a dispute between
beneficiaries to determine its validity.  It also concluded that this was
not a case in which “reasons of justice require[d] an award of attorney’s
fees.”  Although defendants maintained that they had incurred attorney’s
fees “defending the trust” and that it would be inequitable to dilute their
bequests as a consequence, the trial court observed that this was a contest between
beneficiaries and that defendants were “ ‘defending’
their interests in receiving the gifts set out in the seventh amendment and for
no other purpose related to the trust itself.”   

¶ 23.         Although
defendants contend that the court misinterpreted § 1004 in concluding that the
lawsuit did not involve “the administration of a trust,” we need not
specifically address or resolve the claim.  For even assuming that
“administration” of the estate could be construed to include a contest between beneficiaries
over the testator’s capacity or free will in establishing the trust, the issue
would remain whether “justice and equity” require an award of attorney’s fees
under the statute—a question which in this case is largely indistinguishable
from whether the court abused its discretion under its common-law authority in
ruling that attorney’s fees were not required for “reasons of justice.” 
On this issue, we discern no basis to conclude that the court abused its
discretion in determining that this dispute between beneficiaries under the
trust implicated no considerations of justice or equity that warranted an award
of attorney’s fees.  See Knappmiller
v. Bove, 2012 VT 38, ¶ 4, 191 Vt. 629, 48 A.3d 607 (mem.) (observing that awards for attorney’s fees are generally
reviewed for abuse of discretion).[4] 
A similar conclusion follows with respect to defendants’ claim that they were
“equitably” entitled to an award of prejudgment interest on their bequests
under the trust.  See Estate of Fleming v. Nicholson, 168 Vt. 495,
502, 724 A.2d 1026, 1031 (1998) (recognizing that prejudgment interest may be
awarded in court’s discretion “where required to avoid an injustice”). 
The record discloses no basis to conclude that the court abused its discretion
in rejecting the claim that prejudgment interest was required in this case to
avoid injustice.  Accordingly, we discern no basis to disturb the
judgment.

Affirmed. 


  
 
 
  
 
 
 FOR THE COURT:
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Associate
 Justice
 
  











[1] 
Dr. Solomon’s testimony in this regard was corroborated by a number of
witnesses who testified to the testator’s longstanding and active involvement
in several of the community organizations which received bequests under the
seventh amended trust, including the local chapter of the American Legion
Auxiliary, the Ludlow Garden Club, and the United Church of Ludlow.  There
was also evidence of the testator’s ties to two other organizations which
received bequests: the local organization of Masons, of which her husband was a
longstanding member,  and the Black River Senior
Center of Ludlow, which operated the Meals-on-Wheels program that made weekly
deliveries to the testator for a number of years.  

 





[2]  Attorney
Nitka testified that the testator “came to visit me
and she said she wanted to make some changes to her estate plan, her will, her
trust.”    

 





[3] 
To accommodate plaintiffs’ witness schedule the trial court allowed attorney Nitka to testify for defendants out of order, prior to the
close of plaintiffs’ case-in-chief.  The court did not, however, cite or
rely on attorney Nitka’s evidence in finding that the
circumstances were sufficiently suspicious to shift the burden of proof, and,
in fact, later cited his testimony in ruling that defendants had effectively
rebutted the presumption of undue influence.     





[4]
 Although defendants raise a corollary claim that the probate court had
the authority to determine the attorney’s fee issue in the first instance under
§ 1004, they do not specifically challenge the probate court’s ruling in this
matter that, where the civil division already had jurisdiction, “both the law
and common sense dictate the consideration of the award of . . . fees by that
court.”